[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff commenced this action seeking damages and other relief by a six count complaint against the defendants Raymond Brogdon, Scott W. Jezek, Henry M. Aldrich, Scott Goodspeed, Martha Goodspeed and James Matthews (hereinafter the "Aldrich defendants") and the defendants William J. Petzold, Jr., Richard Cote and Elaine Cote (hereinafter the "Petzold defendants"). Prior to trial, the second count and the remainder of the complaint were withdrawn as to the Petzold defendants and the case was tried against the Aldrich defendants on the remaining counts.
The first count of the plaintiff's complaint, in essence, alleges a breach of a mortgage subordination and substitution of collateral agreement, and the third through sixth counts appear to allege tortious interference with plaintiff's contractual rights or expectancies.
From the testimony and documentary evidence, the court finds the following facts: the Petzold and Aldrich defendants individually agreed to purchase certain "dockominium units" or boat slips from one Martin Frimberger at a price of $25,000 per unit. Since the units were not yet in existence, and the Aldrich defendants had among them advanced a total of $150,000 in cash to Frimberger, Frimberger executed and delivered to these defendants five separate notes totalling $175,000,[1] secured by a second mortgage on land in the Town of Old Lyme, which was encumbered by a first mortgage to Essex Savings Bank in the amount of $300,000. The defendants' mortgage deed was timely and duly recorded in the Old Lyme land records on February 16, 1988. The purpose of the mortgage deed and notes was to secure the repayment of the $175,000 aggregate sales price in the event Frimberger was unable to deliver title to the dockominium units on or before December 1, 1989. See CT Page 10786 Plaintiff's Exhibit A; Defendants' Exhibits 1, 2, 3, 4, 5 and 6.
On or about July 26, 1988, at the request of Frimberger, the Aldrich defendants promptly executed and delivered a subordination agreement in favor of Essex Savings Bank's new mortgage of $650,000, recorded July 27, 1988, which replaced its first mortgage of $300,000, as Frimberger had obtained subdivision approval for ten lots on the land. For some unexplained reason the subordination agreement which had been in the possession of the bank's attorney, was not recorded until April 20, 1989. Defendants' Exhibit 8.
The plaintiff began making improvements to the property during the summer of 1988, and in September 1988, entered into a bond for deed with Frimberger to purchase the premises from him by warranty deed. A notice of the bond for deed was duly recorded on the land records and was entered into evidence as Plaintiff's Exhibit G, but significantly, the bond for deed itself was not.
The plaintiff then, during November and December of 1988, took title to the ten lot subdivision by quit claim deeds, neither of which referred to the mortgage of the Essex Savings Bank or the mortgages of the defendants. Defendants' Exhibits 9 and 10. The plaintiff, an experienced developer, accepted and recorded these deeds without performing a title search, claiming instead that he relied on Frimberger, an attorney, for the status of the title and upon the Essex Savings Bank mortgage. The plaintiff claimed to have no notice or knowledge of the mortgages of either the Petzold or Aldrich defendants until late March or early April 1989. By then, the plaintiff had greatly compounded the problem by conveying four of the lots to separate purchasers by warranty deeds and obtaining a construction mortgage in the amount of $250,000 from Farmers Mechanics Bank on a fifth lot. Plaintiff's attorney, Kenneth Davis, who represented the plaintiff and various other parties (including himself as a buyer of one of the lots) in these transactions issued title insurance policies on the lots without performing a full title search of the property. A careful and proper title search would have revealed the mortgages of the Petzold and Aldrich defendants, as both were timely recorded and properly indexed. CT Page 10787
When plaintiff discovered the existence of the defendants' mortgages in the early spring of 1989, a flurry of demands and negotiations began between the parties; the plaintiff demanded partial releases to the four lots sold, and a subordination agreement as to the fifth lot already encumbered by the construction mortgage. When agreement could not be reached, this suit commenced. In April of 1991, the Aldrich defendants assigned their notes and mortgage to the title insurance company and received from it the full amount of the principal due on their notes, together with some interest, less than the full amount accrued, apparently a compromise. Although their notes provided for interest to be paid at eight percent per annum from the date of inception to December 1, 1989 or "upon demand, whichever later occurs," no payments were ever made to these defendants by either Frimberger or the plaintiff, so that as of April 1991, over three years of interest had accrued.
I. Plaintiff's Breach of Contract Claim
The plaintiff asserts that the Aldrich defendants had breached the subordination clause in the mortgage deed by not subordinating their mortgage and providing partial releases for the lots sold. Although not specifically pled, he also asserts that they breached their duty to accept substituted security for their mortgage as also provided for in the mortgage documents.
The Aldrich defendants first argue that their obligations under the mortgage documents ran only to Frimberger. They next argue that even if the plaintiff had standing to enforce the mortgage provisions against them, the plaintiff could not do so, because the transfer of title to him of the mortgaged property was in default of the due-on-sale clause.
They finally argue that even if they had such a duty, the plaintiff did not himself comply with the provisions relating to substitution of the collateral.
The pertinent provisions of the mortgage deed (Defendants' Exhibit 1) are:
 "Maker has the right to substitute the collateral securing CT Page 10788 this obligation at any time provided up to date certificates of title and professional appraisals show that proposed substitute collateral has sufficient equity to secure this obligation."
 "The mortgage securing this note may be subordinated (sic) to accommodate maker's requirements. Prior to any subordination maker will provide an up to date certificate of title and appraisal showing that the proposed collateral property retains sufficient equity to secure maker's promissory note."
 Each of the defendants' notes contains the following provision (Defendants' Exhibits 2, 3, 4, 5 and 6):
 "In the event the Maker hereof ceases to own the property mortgaged to secure this Note, then the whole of this Note shall immediately become due and payable at the option of the Holder hereof."
Neither the mortgage deed or notes contained any provisions for partial releases upon the sale of any lots or parcels from the encumbered property.
Assuming, arguendo, that the Aldrich defendants' duty to subordinate or accept substitute collateral could be read to run to an assignee of Frimberger, such as the plaintiff, which is questionable,[2] the very transfer of title to the plaintiff by Frimberger was in violation of the "due-on-sale" clause and therefore the mortgage notes and deed were in default. It is well settled that a material breach of a contract discharges the other party to the contract from any further duty to render performance of any executory promise. See Bernstein v. Nemeyer, 213 Conn. 665,673 (1990) and cases there cited. Accordingly, the Aldrich defendants had no duty to perform under either the CT Page 10789 subordination or substitute collateral clauses of the mortgage. The validity of due-on-sale clauses has previously been upheld by our Supreme Court. Olean v. Treglia,190 Conn. 756 (1983). This is especially so when the transferee has not, as here, specifically assumed the mortgage. ". . . [I]n Connecticut, contracting parties have the power to make unauthorized transfers of mortgaged property an event of default, triggering an acceleration clause, especially when an unauthorized transfer places the property in the hands of grantees who fail to assume the recorded mortgage." Id., 761, citing Lewis v. Culbertson, 124 Conn. 333, 336-39
(1938). See also Society for Savings v. Bragg, 38 Conn. Sup. 8
(1982). The plaintiff by his own transfers of four lots in violation of the due-on-sale clause was also in default of the mortgage and has not established, by a preponderance of the evidence, that the presumption of validity [of a due-on-sale clause] was overcome by circumstances that make enforcement of the clause unconscionable or inequitable. In this case, the plaintiff received approximately $267,000 from the lot sales and none of the proceeds were paid to the Aldrich defendants.
The plaintiff maintains that the Aldrich defendants waived the due-on-sale clause by failing to exercise their option to accelerate the indebtedness with a reasonable time. Even if this were so, the plaintiff has not proven, by a preponderance of evidence, that he complied with the mortgage terms relating to substitution of collateral or subordination. In either case, the plaintiff would have had to present an "up to date certificate of title and appraisal showing that the proposed collateral property" had sufficient equity to secure the notes. The only appraisal of value plaintiff furnished related to a residence owned by a corporation claimed to have been controlled by him. The appraisal, when furnished, was over six months old in a declining real estate market. The plaintiff did not provide any evidence of the value of the Aldrich defendants' security interest in the ten lots at the time they subordinated their mortgage to the $650,000 mortgage of the Essex Savings Bank, nor any credible evidence as to the value of their remaining equity in the six lots still unsold. Nor did he provide up to date certificates of title as to the unsold lots or the residence offered as substitute collateral. Moreover, the proposed mortgage deed on the residence (Plaintiff's Exhibit O) indicated on its face that it was already subject to three CT Page 10790 mortgages with face amounts totalling $1,100,000 and a mechanics' lien of $30,992.85 which was already in foreclosure. This would have required the Aldrich defendants, in order to prudently protect this proposed security interest, to immediately seek to be made parties in the mechanics' lien foreclosure and involve themselves in litigation. In addition, they would have to assume the risk of being junior to $1,100,000 in mortgages. Nor was any proof whatsoever presented by plaintiff that the three mortgages were in good standing.
The plaintiff simply has not met his burden of showing that he complied with the mortgage terms so that he would be entitled to substitution of collateral for the lots already sold and partial releases, and subordination of the lot encumbered by the construction mortgage.
The plaintiff further argues that the Aldrich defendants waived strict compliance of his duty to furnish up to date certificates of title and appraisals of the property sought to be substituted or subordinated when all of the Aldrich defendants, with the exception of Aldrich, executed and delivered a subordination agreement as to the lot encumbered by a construction mortgage and partial releases of their mortgage to plaintiff's counsel, Davis, as to the four lots sold by plaintiff. Plaintiff's Exhibits C, M. However, the plaintiff ignores the fact that those documents were transmitted to Davis in escrow under certain conditions which were not specified. Upon request, the documents were returned by Attorney Davis from escrow, from which the court infers, that the terms of escrow, whatever they were, were not met. The plaintiff did not prove, as was his burden, what the conditions were, nor why they were not met. A waiver is an intentional relinquishment of a known right. Providing these documents in escrow cannot be considered to be a waiver.
Contrary to the plaintiff's claim, the evidence clearly shows that the defendants did not waive their right to accelerate the indebtedness under the due-on-sale clause. First, Aldrich testified that he refused to sign the subordination agreement and partial releases because he wanted to be paid in full. Under the due-on-sale clause, he had a right to do so. The exercise of his option to accelerate the indebtedness was also contained in a letter CT Page 10791 dated July 6, 1989, sent by defendants' attorney to plaintiff's attorney, Davis. Defendants' Exhibit 32.
Moreover, that letter, although not a model of clarity, offered to waive the accrued interest on behalf of Aldrich and the Petzold defendants, if the principal due on their notes was paid by July 18, 1989. Also contained in Defendants' Exhibit 32 was another letter from defendants' attorney to Davis, dated September 26, 1989, clearly indicating that it was the intention of all of the defendants to demand payment in full, and exercise their option, when the notes matured by their terms anyway. In the light of the defendants holding separate notes, there was no showing by the plaintiff why he did not tender the principal balances (approximately $75,000) of the notes due Aldrich and the Petzold defendants and make use of the subordination agreements and lot releases signed by the other defendants which would have effectively solved his problem. This is especially so in the light of the statement in Davis' letter to defendants' attorney dated September 29, 1989, that "all concerned parties have been cooperating . . ." Defendants' Exhibit 31.
The Aldrich defendants acted reasonably and were within their rights under their mortgage deed and notes to withhold invocation of the due-on-sale clause while negotiating terms in order to protect their collateral or even to seek more favorable terms. This stance was held to be proper in a similar case involving the validity of a due-on-sale clause where the mortgagee demanded an increase in the interest rate in exchange for not exercising his option to accelerate the indebtedness. See Olean v. Treglia,190 Conn. 756, supra.
 II. Claims of Tortious Interference with Plaintiff's Contract Rights or Business Expectancy
The remainder of the plaintiff's complaint appears to allege that the Aldrich defendants tortiously interfered with his contract rights or business expectancies. The third count relates to his construction mortgage with Farmers 
Mechanics Savings Bank; the fourth count relates to his sale of Lot No. 4 to Jerde (Frimberger's ex-wife); the fifth count claims that the defendants' failure to subordinate prevented the plaintiff from further developing the subdivision and CT Page 10792 building a house on Lot No. 10, and that defendants, by sending letters to previous lot purchasers, caused plaintiff damages in his dealings with the purchasers. The sixth count alleges that the defendants have continued to contact banks, a title insurance company, customers and potential customers to the detriment of the plaintiff.
Although nowhere in these counts does the plaintiff allege that the interference was intentional and activated by some improper motive or means, which seem to be essential elements of the cause of action, (see, for example, Blake v. Levy, 191 Conn. 257, 262 (1983); Herman v. Endriss, 187 Conn. 374,377 (1982)), as the case was fully tried and briefed on that theory, even though no amendment was offered, the court will address the plaintiff's claims.
"Our courts have long recognized a cause of action for tortious interference with contract rights or other business relations. (citations omitted) While our cases have not focused with particularity on what acts of interference are tortious, we have made it very clear that not every act that disturbs a contract or business expectancy is actionable. (citation omitted). For a plaintiff successfully to prosecute such an action [he] must prove that the defendant's conduct was in fact tortious. This element may be satisfied by proof that the defendant was guilty of fraud, misrepresentation, intimidation or molestation . . . or that the defendant acted maliciously." Blake v. Levy, supra, 261. Every act of interference is not, however, tortious. The test is whether the actor's behavior is improper. And, a claim for tortious interference is only established once the interference is deemed wrongful by some measure beyond the fact of the interference itself.
The plaintiff at most proved that Jezek and the Aldrich defendants' trial attorney contacted the persons or entities with whom the plaintiff had business relations or contracts. And although some of the Aldrich defendants who plaintiff examined in his case in chief appeared to have some selective memory loss, there was not a single scintilla of credible evidence that any contacts by the defendant Jezek, or anyone else for that matter on behalf of the Aldrich defendants, were made fraudulently, maliciously, or with intimidation, molestation or misrepresentation or by improper means or pursuant to an improper motive. The plaintiff must CT Page 10793 prevail, if at all, on the strength of his case, and not on the weakness of the defendants' case. All that appears from the large number of documentary exhibits and lengthy testimony in this case was that the Aldrich defendants' actions, through their attorneys and with their advice, were prompted and motivated by reasonable financial concerns in safeguarding and not further jeopardizing their security interest for the $175,000 principal plus accrued interest for approximately two-and-a-half years then due and payable to them. This is especially so since it appeared that they could no longer look to Frimberger for repayment. Plaintiff's claims of fraud relating to the original contract for the sale of the dockominium units, and the delay in recording the subordination agreement to Essex Savings Bank, even if true, were not the cause of plaintiff's difficulties. His damages and losses were solely and directly caused by his own failure to exercise reasonable prudence and require a title search of the property before the purchase, and were then compounded by the acts or omissions of Attorney Davis. In any event, the court finds the plaintiff's claims of fraud relating to the dockominium purchase agreement and the delay in recordation of the subordination agreement as causing him damage not credible. Further tending to cast grave doubt on the merits of plaintiff's case and his testimony were his dealings with Frimberger, which included Frimberger co-signing the $250,000 construction mortgage note in February, 1989 to Farmers Mechanics Bank, as a co-borrower, Defendants' Exhibit 20; the plaintiff's transfer of his interest in a $71,000 cash road bond to Frimberger on July 11, 1989, after he learned of Frimberger's duplicity and claimed fraud, Defendants' Exhibit 24; and, the failure of the plaintiff to produce his bond for deed with Frimberger.[3]
Furthermore, plaintiff produced no credible evidence that any of the contacts which were made by, or on behalf of, the Aldrich defendants interfered with the plaintiff's contracts or expectancies or caused him damage.
The plaintiff's claims of intentional tortious interference by the Aldrich defendants with his contract rights or expectancies and that his losses were caused by such claimed interference were not proven by a preponderance of the evidence.
Accordingly, judgment as to the first, third, fourth, fifth and sixth counts shall enter for the CT Page 10794 defendants; together with taxable costs.
TELLER, JUDGE.