[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The instant action has been brought pursuant to Gen. Stat.49-35a by the plaintiff landowners to discharge the defendant's mechanics lien or, in the alternative, to reduce its amount. In such action, the burdens of proof are set forth in Gen. Stat.49-35b. At the hearing, the lienor is first required to establish that probable cause exists to sustain the validity of the lien. Then the landowner has an opportunity to prove by clear and convincing evidence that the lien is invalid or excessive.
The lien was in the amount of $40,000.00. On April 9, 1992, the plaintiffs moved to discharge the lien upon substitution of a surety bond in the same amount. The plaintiffs' motion was granted and the bond was substituted for the lien as of April 27, 1992.
 I.
The substitution of the bond for the lien introduced a new issue into the case. In the plaintiffs' briefs an argument is made that this action is now moot for the reason that the defendant did not institute a suit on the bond within one year from October 4, 1991, the date of recording the certificate of lien. According to the plaintiffs the bond is no longer in effect and Gen. Stat. 49-37(a) requires that this action be dismissed. For the reasons hereinafter set forth, the court disagrees. The claim of mootness, however, implicates subject matter jurisdiction and consequently must be decided first. Statewide Grievance Committee v. Rozbicki, 211 Conn. 232, 345 (1989).
In the 1970's, two substantial revisions were made to the mechanics lien law. See Public Acts 75-418 and 76-290. Section 5 of Public Act 75-418 introduced the procedure utilized in this case, whereby a landowner, such as the plaintiffs, can bring an action for the discharge or reduction of a mechanics lien. CT Page 4672 Section 5 was amended by section 4 of Public Act 76-290 regarding the permissible choices for relief so that upon consideration of the facts, the court is empowered to:
 (1) deny the application or motion if probable cause to sustain the validity of the lien is established, or
 (2) order the lien discharged if (A) probable cause to sustain its validity is not established, or (B) by clear and convincing evidence its invalidity is established, or
 (3) reduce the amount of the lien if the amount is found to be excessive by clear and convincing evidence, or
 (4) order the lien discharged or reduce the amount of the lien conditional upon the posting of a bond with surety in an amount deemed sufficient by the judge to indemnify the lienor for any damage which may occur by the discharge or the reduction of amount.
Section 6 of Public Act 75-415, amended by section 5 of Public Act 76-290, made an order entered upon an application to discharge or reduce a lien a final judgment for the purpose of an appeal which must be taken within seven days of the entry of the order. Section 2 of Public Act 72-290 amended Gen. Stat. 49-39
so that an action to foreclose a lien must begin within one year from the date that the lien was filed or within sixty days after the final disposition of an appeal upon an application to discharge or reduce.
The sections from the two public acts cited above are codified in 49-35b(a) and(b), 49-35c(a) and (b) and 49-39 of the General Statutes.
The last line of Gen. Stat. 49-37 (a) does say: "[w]henever a bond has been substituted for any lien pursuant to this section, unless an action is brought to recover upon the bond within one year from the date of recording the certificate of lien, the bond shall be void." In the court's view, however, the plaintiffs' reliance upon 49-37 (a) is misplaced. CT Page 4673
Section 49-37 (a), except for changing the period of time within which the action on the bond had to be brought from two years to one year, antedates the enactment of Public Act 75-418. The section contains some procedural aspects that were not followed by the plaintiffs. Of far greater importance, however, is the legislative intent behind 49-37 (a) as determined by the Supreme Court. "The legislative intent in enacting 49-37 (a) was to enable the owner or any person `interested' in the property to obtain a dissolution of the mechanics lien so long as the lienor's rights are not prejudiced in doing so. "Henry F. Raab Connecticut, Inc. v. J.W. Fisher Co., 183 Conn. 108, 115 (1981); Six Carpenters, Inc. v. Beach Carpenters Corporation, 172 Conn. 1, 6
(1976).
To the court, the ascertained legislative intent means that the plaintiffs cannot change the nature of their action at a time when the trial was approximately two-thirds completed. Actions brought under Gen. Stat. 49-35a and actions brought under49-37 (a) have been described as separate and distinct. Henry F. Raab Connecticut, Inc. v. J.W. Fisher Co., supra at 113. A statute like 49-37 (a) is designed to facilitate a transfer of property by dissolution of the lien and at the same time to ensure the continued existence of assets from which the lienor may satisfy his claim if he should later prevail and obtain a judgment on the merits of the lien. Id. at 115-16, Six Carpenters, Inc. v. Beach Carpenters Corporation, supra. To hold otherwise would allow the plaintiffs to eliminate the defendants appellate rights as set forth in 49-35c as well as to nullify the time granted to the defendant by 49-39 for the bringing of its own action predicated upon the lien.
 II.
From the evidence that was produced, the facts set forth below are found to have been established.
On March 21, 1991, the plaintiffs and the defendant entered into a contract whereby the defendant was to perform certain excavation work on the plaintiffs' property and to act as the general contractor overseeing the work of others in the construction of the plaintiffs' home in Woodbury. Under the category of "Items to Be Excavated", the defendant was to do the following: "(1) 3000-3500 yds. rock after blast puff up[1] 30%; (2) grade excavated hole refill some good material; (3) install stone for slab either 3/4 stone and or gravel; (4) bring up 1000 yds. on CT Page 4674 premises; (5) install footing drains lay stone pipe; (6) install gutter drains lay stone pipe; (7) dig and backfill el. trench fill with sand 18 inch; (8) dig and backfill water trench fill with 12 inch sand; (9) grade driveway out fill driveway; (10) tear down barn; (11) remove bring wood dig hole and backfill; (12) remove and stockpile stones move only once; (13) grade barn area; (14) rough grade yard; (15) spread topsoil move topsoil and grade; (16) fill garage fill with gravel from field; (17) dig deep hole tests for septic; (18) misc. work for backhoe."
The areas of construction that the defendant was to oversee were listed as "blaster, foundation, framing, roofing, plumbing, electrical, well, septic, any house design, surveying, site eng., waterproof foundation, any steel erecting, all outside hauling, siding, gutters, framing decks, front steps, deck piers, concrete slabs, insulation, drywall, heating and acc., lighting, central vac., alarm, fireplaces, interior stairs, tile, carpet and wood floors." In addition to listing the areas in which the defendant would act as general contractor, the agreement contained the following specific instructions "direct and help blaster; work, schedule and coordinate all contractors; get at least 3 bids on all contracts over $500.00; inspect all contracted work; get all permits; work with all town inspectors; and make sure all work its done to state and local codes."
In the beginning of the contract the consideration for the defendant's services was stated to be $3,333.224 per month starting on March 21, 1991 and continuing thereafter for twelve months until $40,000.00 had been paid. If the work extended past the twelve month period the defendant was to complete it but was not to receive additional compensation. The contract also provided that the plaintiffs would pay for the use of a "Yuke"[2]
machine if one were required and that the plaintiffs would pay charges for the delivery of equipment not to exceed $500.00 per move. But a removal and return of equipment from and to the plaintiffs' site for work on the defendant's other jobs was to be at the defendant's expense.
The plaintiffs terminated the contract in a letter dated August 4, 1991. The letter was written after an oral termination on July 24, 1991. Before being terminated, the defendant had been paid $16,666.20 and had also received $1,450.00 for equipment and rental charges. With respect to the numbered items listed in the category specified as "Items to be excavated," the parties agreed that the defendant had performed nos. 2, 4, 9, 10, 11, 12, 13 and CT Page 4675 17, and at least one-half of 7. The defendant also claimed performance of no. 18. For all these items, the defendant claimed its services were worth $24,112.00.
The principal area of dispute, however, concerns item no. 1 of the items to be excavated "3000-3500 yds. rock after blast puff up 30%" and the related item on the supervisory list "direct and help blaster." It is undisputed that there were three blastings. The first and third ones were characterized by both sides as major. The defendant's position is that in addition to excavating 3500.00 cubic yards of rock pursuant to the contract, there was an additional amount of 2,107[3] cubic yards that was excavated after the subsequent blastings. According to the defendant, the excavated rock was spread on a field pursuant to the plaintiffs' directions.
Support for and disparagement of the defendant's estimate of excavated rock came from documentary evidence and from the testimony of experts and other witnesses. Michael Riordan, a licensed land surveyor, appeared as a witness for the plaintiffs and testified that in his opinion, a total of only 2,744.8 cubic yards of rock had been removed. In arriving at his estimate, Mr. Riordan made a comparison between the elevations shown on a pre-blasting aerial topographic map prepared by Lemuel Johnson and the elevations that he found in the area where the excavation was made for the placement of the dwelling and appurtenances. Contradicting Michael Riordan was James Meyers, an engineer and land surveyor, who testified as an expert for the defendant. Mr. Meyers did no independent field survey work but used Lemuel Johnson's aerial map and the surveys prepared by Mr. Riordan. From visual observations that caused him to differ with Riordan's surveys, Mr. Meyers determined that 3554 cubic yards of rock had been blasted to which 30% or 1066 cubic yards had to be added in order to account for the puff up. Mr. Meyers' figure, therefore, was that 4620 cubic yards of rock had been excavated.
The controversy as to how much rock had been excavated was present on a more mundane level. Before blasting, holes are drilled in the rock for the detonating charges. The defendant hired Britton Explosive Supply, Inc. to do the blasting on the plaintiffs' land. Jeffrey Britton who did the drilling and blasting appeared as a witness. The records of Jeffrey Britton's company showed the following drilling depths for the various blastings: 1680 feet and 1210 feet at the site of the foundation; 480 feet and 1500 feet at the area of the driveway and 432 feet CT Page 4676 between the driveway and the house. To determine how many cubic yards of rock were blasted, the company used a formula of .93 per cent of the total of all drilling depths. The result was 4,467 cubic yards which increased, according to Jeffrey Britton, to about 6,000 cubic yards to account for the 30% puff up.
The controversy extended even to the persons who did the actual loading or trucking the rock away from the blasting sites. Paul Amaral was employed by the defendant to excavate the blasted rock from July 10 through July 16, 1991 and thereafter did similar work for the plaintiffs for approximately one month. Mr. Amaral estimated that he excavated 500 cubic yards when he worked for the defendant and 1500 cubic yards as an employee of the plaintiffs. On the other hand, Timothy Ruselowski who was the defendant's excavator from May 21 through May 30, 1991, estimated that he placed in the Euclid between 2500 and 2800 cubic yards of rock. Application of the 30% puff up factor would increase Ruselowski's estimate to between 3250 and 3640 cubic yards for the first blasting alone.
Edward Simpson, the president of the defendant, stated that $4.50 per cubic yard had been figured into the contract but that $6.00 per cubic yard was a reasonable price for excavating rock after the two additional blastings. Other than disputing the amount of rock taken away, the plaintiffs have not attacked the $6.00 charge.
Time sheets from the owner of the Euclid showed that the rented truck was in service and hence, carried more rock than claimed by the defendant. The Euclid, however, was used by the defendant to carry items other than rock such as felled trees and soil from one part of the plaintiffs' property to others. The defendant's failure to keep contemporaneous records makes the discrepancy unresolvable.
Aside from claims based on rock removal, the defendant also contends that he is owed money for work performed at the plaintiffs' request in relocating the driveway ($1,000.00) and for digging gravel in the area originally planned for the septic system ($1,500.00).
 III.
In the resolution of the parties claims, some additional findings are in order. The second and third blastings creating CT Page 4677 additional excavations of rock, the work on the second driveway and the digging of gravel in the area originally planned for the septic tank were all performed at the plaintiffs' request or at least with their knowledge and consent. The plaintiffs desired to position their house to the land in such a way that the additional work became in great part necessary. Having established these facts, the defendant has demonstrated probable cause to sustain the validity of its lien. Gen. Stat. 49-35b. Probable cause means a bonafide belief by a reasonable person in facts essential for the suit. Pero Building Co. v. Smith, 6 Conn. App. 180, 183
(1986). In a case such as this one, the function of the court is to determine probable cause by weighing the lienor's probability of success. Calfee v. Usman, 224 Conn. 29, 37 (1992).
Gen. Stat. 49-35b places a much more difficult burden on the plaintiffs. "Clear and convincing evidence" has a definite meaning in our law. Clear and convincing evidence means proof sufficient to satisfy a court beyond an average certainty. In re Juvenile Appeal (84-3), cert. denied 193 Conn. 802 (1984). The definition seems to be universal. The clear and convincing standard of proof is evidence that produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. The standard involves evidence that is so clear, direct, weighty and convincing as to enable the factfinder to come to a clear conclusion without hesitancy of the truth of the precise facts in issue. Cruzan v. Director, Missouri Department of Health, 110 S.Ct. 2841, 2855 n. 11.
Borrowing from Justice Harlan's writing in In re Winship,397 U.S. 358, 25 L.Ed.2d 368, 96 S.Ct. 1068 (1970), the descriptions of the various levels of proof may be imprecise but they do communicate to the fact finder different notions concerning the degree of confidence he is expected to have in the correctness of his factual conclusions. 397 U.S. at 370 (Harlan, J. concurring). The validity of the present bond depends upon the validity of the underlying lien. Red Rooster Construction Co. v. River Associates, Inc., 224 Conn. 563, 568 (1993). The plaintiffs have not proven, much less by clear and convincing evidence, that the lien predicated upon work that they authorized is invalid.
Remaining for consideration is whether the bond should remain in its full amount of $40,000.00. The court cannot accept the testimony of the defendant's president that the contract was 80% performed and hence substantially completed. Recovery would appear to be limited to theories of restitution or quantum meruit. CT Page 4678 See Bernstein v. Nemeyer, 213 Conn. 665, 674 (1990); anno. 41 A.L.R. 4th 131, 191 (36). Properly included in the lien are $24,112.00 for the value of the defendant's services under the contract, $12,642.00 for excavation of rock resulting from additional blasting, $1,000.00 for work outside of the contract on the second driveway and $1,500.00 for digging gravel in the area where the septic system was planned. The total of these amounts is $39,254.00 from which the plaintiffs' payments of $18,116.20[4] must be subtracted as established by clear and convincing evidence.
The bond given in lieu of the lien is reduced to $21,137.80.
BARNETT, J.