[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
FACTS
In December, 1988 Ten Granby Town Center Corp. ("TGTCC") was a corporation whose principals were Kevin Daley ("Daley") and M. Michael Humphrey ("Humphrey"). Humphrey was the wife of John J. Daley, III ("Jack"), Daley's brother. Humphrey always went by the name of Mary Daley unless her husband instructed her to use the CT Page 5066 name M. Michael Humphrey, which was her maiden name. Jack was the president of a construction company known as Daley Development Corporation.
In December 1988, TGTCC purchased a strip shopping center (the "Shopping Center") in Granby, Connecticut for $2,100,000. The purchase price was paid with $100,000 in cash and a promissory note for $2,000,000 secured by a purchase money mortgage to the sellers.
In March of 1989 the plaintiffs, Timothy Brignole ("Brignole") and Kevin Bowen ("Bowen"), were attorneys who practiced together in Hartford and Granby. Brignole became aware of Daley's plan to renovate the Shopping Center and approached Daley about the possibility of leasing space in the Center. Brignole then expressed an interest in investing in the Shopping Center. During the course of several meetings Daley showed Brignole a number of documents concerning the Shopping Center. Among those documents was an MAI appraisal which indicated that the Shopping Center would have a fair market value of $4,400,000 after the proposed renovations. Daley also provided Brignole with a pro forma projection of future rentals. Both the pro forma and the appraisal were based in part on what Daley represented as being existing leases of various space in the Shopping Center. Daley represented to Brignole that he had entered into leases for 80% of the space available in the Shopping Center. He further represented the yearly rental amount and term of those leases, including a representation that he had entered into a 10 year lease with Subway for 1200 square feet at a rental of $17 per square foot, a lease with Shopping Plaza Package Store for 2150 square feet at $11 per square foot, and a lease with Dr. Kenneth Endres for 870 square feet at $15 per square foot.
The representations concerning the leases were untrue. Kevin had never entered into a lease with Subway. Dr. Kenneth Endres was a tenant who had moved out of the Shopping Center. The amounts of the yearly rentals from all other tenants were substantially overstated, in several cases by more than twice the actual rental amount. One tenant, Shopping Plaza Package Store, had a lease which called for a yearly rental which was approximately one third of the amount Daley represented as the yearly rental and prevented any increases of the rental amount.
Daley also represented to Brignole that TGTCC was going to finance the renovations by means of a loan in the amount of $2,300,000 from Springfield Institute for Savings ("SIS"), and that CT Page 5067 those loan proceeds would be used as follows: $1,000,000 to reduce the purchase money note to the original sellers, $100,000 to reimburse Daley for the cash portion of the purchase price of the Shopping Center and the remaining $1,200,000 for renovations and construction of the Shopping Center.
Within a short time after Brignole and Daley began their discussions, Bowen expressed an interest in investing in the Shopping Center. He also met with Daley, who made the same representations to him that he had made to Brignole concerning the leases, the appraisal and the use of the SIS loan proceeds.
In the course of the discussions between Brignole, Bowen and Daley, Daley represented that his brother, Jack and his wife, Mary, had substantial assets and that they would guarantee payment of amounts due to Brignole and Bowen if they invested in the Shopping Center. Daley provided Brignole and Bowen with a financial statement for John and Mary Daley dated May 1, 1988, which indicated that they had assets in the amount of $10,286,000 and liabilities in the amount of $4,069,000. The single largest asset listed on that financial statement was the Raybestos Memorial Ballfield in Stratford, Connecticut, with a stated value of $4,200,000. At the trial Jack represented that as of the date of the financial statement and the daze on which that statement was given to Brignole and Bowen, the Raybestos property was not owned by him and his wife, but rather, was owned by Daley Development Corporation. He also testified that that property contained toxic waste which would require $8,000,000 in cleanup costs and that he was aware of the toxic waste in May, 1988, but did not believe that disclosure of that problem was necessary on the financial statement because "toxic waste was not a problem in 1988."
Brignole, Bowen and Daley ultimately agreed that the investment of Brignole and Bowen in the Shopping Center would take the form of a purchase of stock in TGTCC. In April, 1989 Brignole, Bowen, Daley, Humphrey, and Jack entered into a Stock Purchase and Sale Agreement (the "Agreement") under the terms of which Brignole agreed to purchase 33% of the stock in TGTCC for $300,000 and Bowen agreed to purchase 11% for $100,000. The purchase price for the stock was to be paid in two installments, one due upon the signing of the Agreement and the other upon the sooner of six months from the signing, or the date TGTCC obtained temporary certificates of occupancy on all leasable space in the Shopping Center.
The Agreement also contained the following pertinent CT Page 5068 provisions: the $2,300,000 loan from SIS would be used as the capital of the corporation; Daley was President and Treasurer of TGTCC and Humphrey was Vice President and Secretary; Daley and Humphrey each owned 28% of the stock in TGTCC; Daley and Humphrey were not entitled to compensation, but were entitled to 3% of the gross rental received from the Shopping Center. The Agreement further provided that Brignole and Bowen were to receive 15% per annum as a return on their investment, and that at the end of three years and six months from the signing of the Agreement, Brignole and Bowen were to receive $550,000 and $163,000, respectively, for their shares in TGTCC. Both the annual return and the price of their shares were guaranteed by Daley and Humphrey.
Upon the signing of the Agreement in April, 1989 Brignole and Bowen paid their first installments of $150,000 and $75,000, respectively, to Daley and Humphrey. Shortly after the Agreement was signed TGTCC entered into the loan transaction with Springfield institute for Savings. As a result of that transaction, Daley received $100,000 as reimbursement for his entire investment in the Shopping Center and TGTCC had $1,200,000 available for renovations and construction.
Under the terms of the Agreement the guaranteed monthly payments to Brignole and Bowen "shall in the first year be escrowed from Springfield Institute for Savings closing funds or such other funds Kevin Daley and M. Michael Humphrey may deem appropriate, so long as one (1) full year of payments is maintained in a separate escrow account designated for said payments." Agreement ¶ 10. TGTCC made monthly interest payments to Brignole and Bowen in accordance with the terms of the Agreement until November, 1989.
Daley's attorney advised him, Humphrey and Jack not to enter into the Agreement because the Agreement was favorable to Brignole and Bowen. However, Daley elected to execute the Agreement, notwithstanding his attorney's unfavorable opinion of the Agreement because he needed money fast in order to support other real estate projects in which he was involved. Of the $150,000 which Daley initially received from Brignole, $130,000 went directly to "The Oaks," another development project in which Daley was involved.
Construction and renovation of the Shopping Center commenced in April of 1989 under the supervision and control of Daley. In July of 1989 Daley informed Brignole and Bowen that the project was in financial trouble. He asked Bowen to make his remaining payment of $25,000 and asked Brignole to make $25,000 of his remaining CT Page 5069 payment. Although those payments were not due until October, 1989, Brignole and Bowen each paid Daley an additional $25,000 in July of 1989. At the trial of this case Jack testified that Daley could have completed the Shopping Center if TGTCC had received an additional $125,000 (from Brignole). As of July, 1989, Daley had improperly diverted more than that amount from the funds of TGTCC, as is more fully set forth below. Therefore, the court concludes that TGTCC was in financial trouble largely because of that improper diversion.
By September, 1989 construction on the Shopping Center had come to a halt and subcontractors and materialmen were beginning to file mechanic's liens on the Shopping Center property. When Brignole and Bowen did not receive their monthly interest payment in November of 1989, Brignole requested a meeting with Daley and his brother Jack. That meeting occurred in December, 1989 in Middletown, Connecticut. At the meeting Jack apologized for the problems with the Shopping Center and said that he and Daley would "make things right," and put the project "back on track." Jack also agreed to allow an accountant to review the checkbook and other records of TGTCC Neither Jack, nor Daley made any demand at that meeting or at any other time that Brignole contribute the remainder of his investment amount called for under the terms of the Agreement.
Brignole and Bowen retained the services of the accounting firm of Kostin Ruffkess to review the checkbook and other records of TGTCC. Jeffrey Neistat, a certified public accountant with Kostin Ruffkess reviewed those records and found that Daley had used $288,995.25 for purposes unrelated to the Shopping Center or the business of TGTCC, including payments of $52,170.88 for a Daley Development project known as "Cambridge," $59,978 for a Daley Development project known as "Merchant's Walk," and $9800 for a Daley Development project known as "The Oaks." In addition, Daley disbursed $34,975.74 to himself, even though he was not supposed to receive any compensation other than a management fee for rentals collected. That fee should have been only $1,590 because only $53,000 in rentals were collected during the period in question. During the period from April, 1989 until December, 1989, Daley wrote approximately 400 checks on the account of TGTCC. The total amount of the first 45 checks written was $126,106.33. Checks written for purposes unrelated to the Shopping Center or the business of TGTCC accounted for more than 80% of that amount, or $100,885.01. TGTCC ran out of money, the Shopping Center was not completed and, thereafter, Brignole and Bowen commenced this CT Page 5070 lawsuit.
LIABILITY
In the First Count of the complaint the plaintiffs allege that the defendants made various fraudulent misrepresentations on which the plaintiffs relied in entering into the Agreement. The elements of a fraud action are: (1) a false representation was made as a statement of fact; (2) the statement was untrue and known to be so by its maker; (3) the statement was made with the intent of inducing reliance thereon; and (4) the other party relied on the statement to his detriment. Mitchell v. Mitchell, 31 Conn. App. 331,625 A.2d 828 (1993); Billington v. Billington, 220 Conn. 212,217, 595 A.2d 1377 (1991); Maturo v. Gerard, 196 Conn. 584,494 A.2d 1199 (1985); Paiva v. Vanech Heights Construction Co.,159 Conn. 512, 515, 271 A.2d 69 (1970). "[A] promise to do an act in the future when coupled with a present intent not to fulfill it, is a false representation." Flaherty v. Schettino, 136 Conn. 222, 226,70 A.2d 151 (1949) Fraud is not to be presumed but must be proven by clear, precise and unequivocal evidence. Connell v. Connell,214 Conn. 242, 252, 571 A.2d 116 (1990); Puro v. Henry, 188 Conn. 301,308, 449 A.2d 176 (1982); Alaimo v. Royer, 188 Conn. 36,448 A.2d 107 (1982).
One of the plaintiffs' claims as to fraudulent misrepresentations centers around Daley's representations concerning the value of the Shopping Center. The plaintiffs claim that Daley's misrepresentations concerning the leasing status of the Shopping Center and the appraisal Daley gave them, which was based on false statements about the leases, both constitute fraudulent misrepresentations by Daley. The court finds that Daley represented that the Shopping Center was 80% leased, which he knew was not true. He also represented that the terms of the leases that did exist were much more favorable than they were when he knew that those representations were untrue. He made those representations for the purpose of inducing Brignole and Bowen to enter into the Agreement and they relied on those misrepresentations in entering into the Agreement.
The defendants argue that Brignole and Bowen were well acquainted with the Shopping Center and could have seen what portion thereof was leased. The purpose of that argument is unclear. However, the court assumes that the defendants have advanced it to show that Brignole and Bowen did not rely on, or should not have relied on, Daley's representations about the CT Page 5071 leases. However, the familiarity of Brignole and Bowen with the Shopping Center will not defeat their claim that the Daley's representations about the leases were fraudulent because Daley had the best means to know about the leases. See Clark v. Haggard,141 Conn. 668, 673, 109 A.2d 358 (1954). Furthermore, a visual inspection of the Shopping Center would not have revealed information about the leases, such as term or rental, or the identity of tenants who would not assume occupancy until after renovation of the Shopping Center. A claim for fraudulent misrepresentation "is not necessarily destroyed because the [party to whom the representations are made] failed to make an independent investigation which would have revealed that the representation upon which he relied was false. Kavarco v. T.J.E., Inc.,2 Conn. App. 294, 478 A.2d 257 (1984); Pacelli Bros. Transportation,Inc. v. Pacelli, 189 Conn. 401, 409, 456 A.2d 325 (1983). The Appellate Court in Kavarco stated:
 To shield a seller with a buyer's negligence in not finding out whether the representation was true or false would be to give a seller the fruit of his falsehood. The defendants' argument raises the issue of whether the law should choose either to allow the person who fraudulently misrepresented a basic fact to use the armament of caveat emptor to escape liability, or not to require the person to whom them is representation was made to conduct an independent investigation as to the truth of an ascertainable fact. The Restatement chooses the latter. 2 Restatement (Second), Torts 540. This court does also.
2 Conn. App. at 301-302.
The appraisal which Daley provided to Brignole and Bowen cannot constitute a fraudulent misrepresentation by Daley. The appraisal was performed by an appraiser. Although it was based in part on Daley's false representations about existing leases, it was still the opinion of an appraiser, not a statement of fact by Daley.
Prior to the execution of the Agreement Daley represented to Brignole and Bowen that the loan proceeds received by TGTCC from SIS would be used for construction and rehabilitation of the Shopping Center. Immediately upon receiving the proceeds from SIS, Daley began using them for purposes completely unrelated to the construction or rehabilitation of the Shopping Center. "[A] CT Page 5072 promise to do an act in the future when coupled with a present intent not to fulfill it, is a false representation." Flaherty v.Schettino, 136 Conn. 222, 226, 70 A.2d 151 (1949); Mitchell v.Mitchell, 31 Conn. App. 331, 625 A.2d 828 (1993). "[O]rdinarily, intent can only be proved by circumstantial evidence; it may be and usually is inferred from the defendant's conduct." (Internal quotation marks omitted.) Kelley v. Bonney, 221 Conn. 549, 583,606 A.2d 693 (1992).
Where the defendant promised that if the plaintiff deeded him his house, the defendant would give the plaintiff a life estate in the house and shortly thereafter prepared a deed which contained no provision for the plaintiff's life estate, the court properly inferred that the defendant intended to defraud the plaintiff.Mitchell v. Mitchell, supra. In this case Daley represented that the loan proceeds would be used only for the purposes of the Shopping Center, yet as soon as TGTCC received those loan proceeds, Daley began using them to make substantial payments to other Daley Development projects and other purposes completely unrelated to the Shopping Center. The court infers from the foregoing conduct that when Daley represented that the TGTCC funds from Springfield Institute for Savings would be used only for construction and renovation of the Shopping Center, he did not intend to so limit the use of the funds. The representation was, therefore, fraudulent.
The plaintiffs claim that the financial statements of Daley and Jack and his wife were false representations about financial condition and constitute fraudulent representations. The financial statement of John Daley and his wife Mary M. Humphrey Daley purported to show assets of over 10 million dollars, and liabilities of over 4 million dollars. The assets were composed of real estate and interests in real estate limited partnerships, with the exception of $21,000 in cash, $9,000 in automobiles and $145,000 in other unspecified "personal assets." The plaintiffs claim that that financial statement "lulled them into a false sense of security" about the financial strength of Humphrey.
The plaintiffs proved that the Raybestos Ball Field was improperly included in the financial statement of Mary and John Daley because it was owned by Daley Development Corporation. However, the plaintiffs failed to prove by clear and convincing evidence that the value of the other assets listed on the financial statement were incorrectly stated. Moreover, the plaintiffs are attorneys. They could not have reasonably relied on the financial statement to conclude that the Daleys were people of any CT Page 5073 substantial financial strength.
The plaintiffs seek to hold Humphrey and Jack liable for the Daley's misrepresentations. A principal may be liable for the intentional torts of his agent, if the agent is acting within the scope of his authority in furtherance of the principal's business.A-G Foods, Inc. v. Pepperidge Farms, Inc., 216 Conn. 200,579 A.2d 69 (1990). The defendants have conceded that Daley was acting as the agent of Humphrey and Jack. Defendants' Trial Brief, p. 12. Therefore, Humphrey and Jack are liable for the fraudulent misrepresentations of Daley.
The Second Count of the complaint alleges that the defendants breached the Agreement and the court finds that Daley and Humphrey did breach their obligations under the terms of the Agreement to establish an escrow account for one full year of interest payments due to Brignole and Bowen and to make monthly interest payments. The defendants argue that Brignole and Bowen breached the Agreement first and, therefore, the defendants are not liable for breach of contract under Bernstein v. Nemeyer, 213 Conn. 665, 672-73,570 A.2d 164 (1990) and Rokalor, Inc. v. Connecticut EatingEnterprises, Inc., 18 Conn. App. 384, 391, 92, 558 A.2d 265 (1989). This argument is based on the claim that Brignole did not pay the balance of the purchase price for the stock, which amount the defendants claim was guaranteed by Bowen. The court finds that the defendants never requested Brignole to contribute the last installment owed for the stock. Moreover, at the time Brignole's second installment was due the defendants had already breached the Agreement by failing to set up the escrow account and by failing to use the proceeds of the SIS loan solely for TGTCC purposes.
The Third Count of the Complaint alleges that Daley and Humphrey breached a fiduciary duty owed to Brignole and Bowen. Daley had complete control over the day to day operations of TGTCC. He and Humphrey, for whom he acted as an agent, had a majority stock ownership in the corporation. An officer and/or majority shareholder of a corporation has a fiduciary duty to the other shareholders of the corporation. Banks v. Vito, 19 Conn. App. 256,262, 562 A.2d 71 (1989). "Authority exists in this state for officers, directors, and majority shareholders to be held personally liable for breach of fiduciary duty when evidence shows a misappropriation of corporate funds for personal benefit and subsequent fraudulent concealment. See Pacelli Bros.Transportation, Inc. v. Pacelli, 189 Conn. 401, 407-409,456 A.2d 325 (1983)." Id. In the recent case of Konover Development Corp.CT Page 5074v. Zeller, 228 Conn. 206, 218, ___ A.2d ___ (1994) the court stated:
 Proof of a fiduciary relationship imposes a twofold burden on the fiduciary. First, the burden of proof shifts to the fiduciary; and second, the standard of proof is clear and convincing evidence. "Once a fiduciary relationship is found to exist, the burden of proving fair dealing properly shifts to the fiduciary. . . . Furthermore, the standard of proof for establishing fair dealing is not the ordinary standard of proof of fair preponderance of the evidence, but requires clear and satisfactory evidence or clear, convincing and unequivocal evidence." (Citations omitted; internal quotation marks omitted.) Dunham v. Dunham, supra, 322-23; Oakhill Associates v. D'Amato, 30 Conn. App. 356, 358, 620 A.2d 1294, cert. granted, 225 Conn. 926, 652 A.2d 826 (1993).
By appropriating more than $250,000 in funds of the corporation to his own uses, Daley clearly breached a fiduciary duty to Brignole and Bowen. He offered no evidence whatsoever to support any claim of fair dealing in executing his fiduciary obligations.
In the Fourth Count of the Complaint, the plaintiffs seek to recover under § 36-472 of the Connecticut General Statutes, which provides:
 No person shall, in connection with the offer, sale or purchase of any security, directly or indirectly: (1) Employ any device, scheme or artifice to defraud; (2) make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or (3) engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.
Daley made untrue statements of material fact in connection with the sale of the stock in TGTCC to Brignole and Bowen. Therefore, he violated § 36-472. Connecticut General Statutes § 36-498 provides that a buyer of securities to whom material misrepresentations are made may recover consideration paid, together with reasonable attorneys' fees and interest at the rate of 8% from the date of payment, less any income received from the CT Page 5075 security. The court finds in favor of Brignole and Bowen on the Fourth Count against Daley.
DAMAGES
In Kavarco v. T.J.E., Inc., 2 Conn. App. 294, 298-99, the Court stated:
 At the option of the defrauded party, where there has been fraud in the inducement of the contract, the contract is voidable or subjects the defrauding party to a suit for damages. A. Sangivanni Sons v. E.M. Floryan Co., 158 Conn. 467, 472, 262 A.2d 159 (1969). The party defrauded has the option of electing either to rescind the contract or to claim damages for the breach of the contract. Pacelli Bros. Transportation, Inc. v. Pacelli, 189 Conn. 401, 409-10, 456 A.2d 325 (1983). To seek rescission is to waive any claim for damages arising from a breach of the contract. Duksa v. Middletown, 192 Conn. 191, 197, 472 A.2d 1 (1984). The remedy of rescission and restitution is an alternative to damages in an action for breach of contract. 12 Williston, Contracts (3d Ed. Jaeger) 1455, p. 14. Rescission, simply stated, is the unmaking of a contract. It is a renouncement of the contract and any property obtained pursuant to the contract, and places the parties, as nearly as possible, in the same situation as existed just prior to the execution of the contract. A condition precedent to rescission is the offer to restore the other party to its former condition as nearly as possible.[5] Duksa v. Middletown, supra; Keyes v. Brown, 155 Conn. 469, 476, 232 A.2d 486 (1967).
The plaintiffs cannot seek rescission of the contract because they have, not surprisingly, not offered to return the interest payments that they did receive under the Agreement. However they can recover for breach of contract. Therefore, the amount of damages on the First, Second and Third Counts of the complaint are the same, except the plaintiffs are also entitled to punitive damages on the First Count. On the First, Second and Third Count the court awards Brignole the amount of $320,833, which is the amount he was to receive for his stock three and one half years after the Agreement was signed. The court also awards Brignole, $78,750, the amount of guaranteed return under the Agreement and interest at the rate of 10% per annum from September 1, 1992. The CT Page 5076 court awards Bowen $183,000 for his stock, $45,000 for guaranteed return and interest at the rate of 10% per annum from September 1, 1992. The foregoing awards are entered against Kevin Daley, Mary Daley (Humphrey), and John J. Daley III as to First Count and Kevin Daley and Mary Daley as to the Second Count and as to Kevin Daley only as to the Third Count.
The court also awards punitive damages on the First Count in the reasonable amount of the plaintiffs' attorneys' fees and costs, which amount must be determined at a future hearing.
As to the Fourth Count, the court awards Brignole and Bowen the amount of $275,000, plus interest from April 12, 1989, plus a reasonable attorneys' fee less $16,905.23, the amounts which TGTCC paid to Brignole and Bowen. The foregoing amounts are awarded against Kevin Daley only.
By the Court,
Aurigemma, J.