[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The Plaintiffs in this matter, Heritage Benefit Agency, Inc. and Heritage Benefit Consultants, Inc. ("Heritage"), are closely held corporations organized under the laws of the State of Connecticut with offices located in Watertown and Mystic, Connecticut. Rocco Marciano ("Marciano") is the president of both corporations.
Heritage Benefit Consultants, Inc. provides for its clients, which are small to medium sized businesses, plan administration services regarding their defined benefit plans, 401k plans, pension plans and profit sharing plans. Heritage Benefit Agency, Inc., an affiliated company, provides investment advice to its clients. The corporations work in unison to serve the same clients and realize a benefit from their joint efforts.
Thomas Cole ("Cole") was employed at Heritage from 1983 to October 27, 2000. He became an enrolled actuary in 1989 and acted as a plan administrator for Heritage clients.
During the course of his employment, Cole had access to client files, client lists, service agreements, calculations and other information including; (a) client names, (b) type of industry, (c) size of client, CT Page 2892 (d) names of contact people, (e) geographic locations (f) goals on contribution ratios between high and low earning employees, (g) desired diversification of portfolios (h) fee tolerance and (i) commission structures and rates.
James Crocicchia ("Crocicchia") was employed at Heritage from 1990 to October 27, 2000. He was hired as a sales representative to solicit new clients, provide investment advice and sell life insurance products to Heritage clients.
The relationships Crocicchia developed while at Heritage provided him with knowledge of clients'; (a) names, (b) type of industry, (c) size, (d) contact people, (e) geographic location, (f) investment history, (g) investment risk tolerance and return on investments desired, (h) goals on contribution ratios between high and tow earning employees, (I) desired diversification of portfolio, (j) fee tolerance, and (k) commission structure and rates.
Cole's Employment Agreement
In April of 1993, Thomas Cole entered into a written Employment Agreement with Heritage Benefit Consultants, Inc.[1] The Employment Agreement contained in relevant part (a) a covenant not to compete, (b) a covenant not to solicit clients, (c) a covenant not to sell to clients of Heritage Benefit, (d) a covenant not to contact any individual or entity including, but not limited to life insurance agents, managerial personnel, attorneys, accountants, trust officers, or stock brokers to whom the employee has been introduced by the corporation and (e) a covenant not to solicit Heritage employees.
The Employment Agreement also contained two additional handwritten terms that were added by Cole and agreed to by Marciano on behalf of Heritage Benefit Consultants, Inc.
Cole wrote into the contract that unless he had the right of first refusal regarding any transfer of stock in Heritage Benefit Consultants, the contract would be terminated automatically. This language does not appear in the partial Employment Agreement submitted as an exhibit, however, based on secondary evidence presented during the trial the court finds that it was a term of the Agreement.
The contract also contained a handwritten provision that "any change in current ownership" would result in automatic termination of the Employment Agreement.[2] At the time the Employment Agreement was entered into, Rocco D. Marciano and his wife, Nancy Marciano, held a majority interest in Heritage Benefit Consultants, Inc. In 1997, Nancy CT Page 2893 Marciano became terminally ill. In an endeavor to maximize the benefits of her estate planning, Marciano employed an attorney to draft a Will and several Trusts. In 1998, Rocco D. Marciano transferred many of his assets to his wife to maximize efficiency of the tax code. One of the transfers performed in Nancy Marciano's estate planning included the transfer of stock held by Rocco D. Marciano in Heritage Benefit Consultants, Inc. to Nancy Marciano. She died the day after the transfer of stock and it became part of her estate.
Thomas Cole was aware of all of the stock transfers and did not claim that there had been a violation of his right of first refusal. He also did not declare that the Employment Agreement was automatically terminated. Instead, he continued to work and receive benefits from Heritage.
Plaintiffs contend that in consideration for entering into the Employment Agreement, Thomas Cole received: (a) continued employment, (b) a raise in his base pay from $52,000.00 per year to $62,500.00 per year, retroactive, (c) a right to medical benefits, (d) rights to yearly cost of living adjustments, (e) 3% stock in Heritage Benefit Consultants, Inc., (f) rights to disability benefits, and (g) rights to severance pay and severance notice.
Part of this alleged consideration had already been agreed to by the parties. Specifically, in July of 1992, the plaintiff had already agreed to pay Cole a raise of $10,000 effective August of 1992. This earlier agreement is therefore reflected in the Employment Agreement but was not consideration for it.
In addition, Cole never received most of the alleged consideration for the Employment Agreement. The Employment Agreement provided for a cost of living adjustment to Cole's base compensation on a yearly basis. Cole did not receive an increase in his base compensation in 1995, 1996 or 1998.
Additionally, the stock certificates for the stock promised under the Employment Agreement were never delivered to Cole. The agreement specifically stated "Upon execution of this Agreement, Employee shall forthwith receive from Corporation 3% of all issued and outstanding capital stock of the Corporation as a one time signing bonus and the certificate for such shares shall be issued in the Employee's name." The agreement also provided for voting rights, and rights to dividends and distributions.
Cole testified credibly that he requested the shares within a month or two after signing the agreement, again six months later, and then several times over the following years. Marciano admitted that he never CT Page 2894 transferred the stock certificates to Cole.
While the corporate books were not in Marciano's possession for a period of years, Marciano received the corporate books of Heritage Benefit Consultants, Inc. in September of 2000. Marciano still never took any steps to issue stock to Cole.
Additionally, none of the documentation reflects that Cole was considered to be a stockholder of HBC. The Heritage tax returns for 1997 state that Rocco Marciano owned 100% of the shares of stock. The Heritage tax returns in 1998 and 1999, signed by Mr. Marciano, reflect that Mr. Marciano, as executor of the estate of Nancy Marciano, is a 100% shareholder. The by-laws signed in September 2000 of Heritage Benefit Consultants, Inc. designate Mr. Marciano, as the executor of the estate of Nancy Marciano, as the sole shareholder. The probate court inventory, signed by Mr. Marciano and prepared by his attorney, reflects that the estate owns 100% of the shares of Heritage Benefit Consultants, Inc. When Mr. Marciano applied for a loan in 1999, he stated that he, as executor, was the owner of Heritage Benefit Consultants, Inc. and Heritage Benefit Agency, Inc.
Cole was also not treated as a stockholder. Cole was never given notice of any shareholders' meetings, nor were any other corporate formalities exercised which included Mr. Cole. No dividends were ever paid to Mr. Cole as a shareholder.
Plaintiffs allege that in 1997, Cole agreed to receive compensation in lieu of the actual stock certificates. However, it is undisputed that Cole has never received any compensation for the value of the stock.
In the course of the negotiations to purchase the Heritage companies, Marciano repeatedly recognized the company's obligation to Cole regarding the stock. Marciano testified that he intended to give Cole the value of the stock when the company was sold. However, when the employment agreement was signed in 1993, and when the alleged modification of the agreement was reached to give Cole the value of the stock in 1997, the parties were not engaged in negotiations regarding the sale of the company. To date, Cole has never received the stock or the value of the stock.
Sale of the Business and Profit Sharing
Cole and Crocicchia had became increasingly frustrated with the lack of time that Marciano was putting into the business in the mid 1990's through 1998. In the latter part of 1998, they had several discussions with Marciano in which they voiced their dissatisfaction. In December of CT Page 2895 1998, Mr. Cole and Mr. Crocicchia expressed their dissatisfaction to Mr. Marciano again. They told him that either Mr. Marciano would have to work harder or the financial arrangement would have to change. They also stated that if things did not change, they would explore other employment options. Mr. Marciano then agreed to share "profits" equally with Mr. Cole and Mr. Crocicchia.
At the end of 1998, Thomas Cole, James Crocicchia, and Rocco D. Marciano also discussed the concept of an agreement wherein Thomas Cole and James Crocicchia would purchase the stock of Heritage Benefit Consultants, Inc. and Heritage Benefit Agency, through an ESOP, in the amount of $700,000.00.
Thomas Cole and James Crocicchia eventually decided that an ESOP to acquire the business was not feasible. In the fall of 2000, Thomas Cole and James Crocicchia offered to pursue the stock of Heritage Benefit Consultants, Inc. and Heritage Benefit Agency for $700,000. Despite on-going good faith negotiations the parties were never able to reach an agreement regarding the sale of Heritage Benefit Consultants and Heritage Benefit Agency to Cole and Crocicchia.
On October 27, 2000, at approximately 12:00 p.m., Thomas Cole and James Crocicchia faxed their resignations to the Watertown Office of Heritage Benefit Consultants, Inc.
Events Subsequent to Resignation
In the late afternoon of October 27, 2000, Cole and Crocicchia contacted Lisa Dean (the only plan administrator remaining in the Watertown Office) in a conference call to solicit her employment.
Thomas Cole and James Crocicchia are currently conducting business under the name of Charter Oak Pension Group LLC and Charter Oak Agency LLC. They are actively targeting and soliciting the clients of Heritage Benefit Consultants, Inc.[3] They have solicited in total, about forty to fifty of Heritage Benefit Consultants clients, of which, fifteen have elected to go with Charter Oak Pension Group LLC.
As a result of the Defendants' solicitation of Heritage Benefit Consultants, Inc. clients, the following clients have terminated their business relationship with Heritage Benefit Consultants, Inc.:
a. D.W. Van Dyke
b. Creative Management Realty, Inc. CT Page 2896
c. GTI Technologies
d. Transportation Solutions, Inc.
e. Dr. John Salius
f. Alloy Specialties, Inc.
g. Devlin, Peters Tarpey, LLC
h. Cargill Chevrolet
i. NESS Incorporated
j. Risk Assessment Strategies
k. Sgorbati Associates, Inc.
l. East Center Dentistry
m. Corky's Auto Body, Inc.
n. Waterbury Glass Mirror, Inc.
o. The Drawn Metal Tube Company
James Crocicchia provided the above referenced clients with pre-addressed letters addressed to Rocco D. Marciano directing that accounts be transferred from the Plaintiffs to the Defendants.
All communications and efforts associated with the solicitation of the Heritage clients occurred after the defendants' resignations on October 27, 2000. Cole and Crocicchia did not remove any client lists from Heritage. Cole did not remove any documents, discs or other property of Heritage upon his resignation. Crocicchia did have a file entitled "Sales Pending File" in his car. Upon realizing that he had the file, he immediately returned it. Additionally, Crocicchia retained the files he had maintained as a Jefferson Pilot securities representative. In order to be able to sell securities, Crocicchia was a registered agent with Jefferson Pilot Securities Corporation. He held the license in his name and not in the name of Heritage. According to the Jefferson Pilot manual provided to Crocicchia, the records are the property of Jefferson Pilot Securities and not Heritage. Crocicchia was the only NASD licensed dealer associated with Heritage.
The defendants agreed to provide the exact same services to clients who CT Page 2897 transferred their accounts as had been provided by Heritage. They also agreed to match the fees that were being charged by Heritage. Neither Mr. Cole nor Mr. Crocicchia memorized any fees schedules. However, they generally knew what the fee structures were that were utilized by Heritage and other competitors.
Defendants obtained from the clients themselves any documentation necessary to service their clients with whom they now have agreements. The only information not supplied by the clients that is necessary to service the accounts are certain calculations, which will have to be redone by the defendants.
Client Names
Services on the Internet, including free ERISA.com, make available to the public a list of all employers who have filed a Form 5500. This list includes all of the clients of Heritage. This information can be accessed by pressing any letter of the alphabet, and can be searched by town or state. A copy of the Form 5500 and each applicable schedule is available on this service. The information available includes the following: Name of Plan Sponsor; address; employer identification number; telephone number; number of participant; listing of assets; name of trustees; name of brokers; listing of insurance companies used in funding the plan; amount of funds held by each insurance company; name of actuary; and beginning with the 1999 Form 5500, the name of the Third Party Administrator.
In addition, at least four Internet services, including Larkspur Gold to which the defendants have subscribed, can provide the names of pension administrators, brokers and actuaries that provide service to a specific plan. By using this service and entering the Heritage name, the defendants were able to identify approximately 120 clients of Heritage and 10 of the 15 clients that were solicited and became clients of Charter Oak. This information can be obtained several different ways including by name of company and by name of actuary. All plan data for each of Charter Oak's fourteen clients is available by inputting their names into the Larkspur system. In addition, all of Charter Oak's fourteen clients are listed on the Internet at Smartpage.com, which lists the clients' phone numbers, addresses and directions to their offices. This information was current through the end of 1998.
It was generally known among plan administrators that served the greater Waterbury area which administrators were servicing which companies. The parties stipulated that most clients of Heritage are listed in the yellow pages and other business directories. CT Page 2898
The ranges of the fees charged in the pension administration industry are generally known throughout the industry. The ranges of fees and items for which pension administration services can be billed are available on the Internet and in various studies. Additionally, Mr. Cole and Mr. Marciano attended an annual conference in April 1998. Each year, all participants are asked to fill out a form indicating their fees. At the April 1998 conference, at Mr. Marciano "s request, Mr. Cole filled out the form indicating what Heritage's fees were. This information was then shared with the other participants at the seminar.
When Heritage bids for potential new accounts, they submit fees without requesting that this information be kept confidential. Mr. Crocicchia often discussed fees with plan administrators with whom he was competing and would learn of competitor's fees when he would make bids for services to competitors' clients. Mr. Gobes, a pension actuary expert witness, testified credibly that there is nothing unique or special about fees charged by plan administrators. He testified that everyone in the industry charges for the same types of services and most charge within a certain range for those services.
Types of Services
Charter Oak is providing the same pension administration services Heritage provided to its former clients. These services include those which are necessary to comply with ERISA, the Internal Revenue Code and the corresponding regulations. Mr. Gobes testified credibly that it is generally known in the pension administration community what services are provided by administrators.
Cross-Tested Plans
The ability to create a cross-tested plan is not unique and is generally known in the pension administration community. Software is available on the Internet which can produce a "Cross-Tested" design. The IRS has also approved the "Volume Submitter" plans which have language pre-approved by the IRS. This enables pension administrators to answer a series of questions in order to build a Qualified Plan Document on Microsoft Word.
The calculations and formulas required to test plans to make sure they are in compliance with IRS regulations are generally known in the industry. Heritage performed those calculations on a LOTUS software program that can be purchased by the public. Mr. Gobes testified credibly that it would be a disadvantage for a plan administrator to not know how to cross-test, since doing so is standard in the industry. CT Page 2899
Commissions
Life insurance companies have commission schedules that apply to plan administrators that they do business with. Neither Mr. Cole nor Mr. Crocicchia memorized these rates. Instead, after resigning, they called their contacts at certain insurance companies that they had worked with while at Heritage. However, they could have simply called the insurance companies and asked the pension department to identify the appropriate contact person.
Heritage had special commission arrangements with Sentry Life Insurance Company, Guardian Life Insurance Company and The Hartford Life Insurance Company. Charter Oak does not have a relationship with Sentry Life Insurance. Charter Oak is licensed with Guardian and The Hartford, but has no special commission arrangement with these companies.
Investments
Crocicchia provided investment counseling to many of Heritage's clients. Crocicchia's investment advice generally focused on meeting the client's needs regarding striking a balance of high risk and low risk investment vehicles. The type of investment vehicles that were available to Crocicchia were generally known and available to other investment advisors. However, Crocicchia learned of clients' preferences regarding investments through his work at Heritage.
Confidentiality of Records
Heritage had no written confidentiality policies. While only Marciano, the office manager and the bookkeeper had access to the master list of clients, this appears to be the only precaution that was taken to protect information. The file cabinets containing client files were never locked and all employees had access to them. Client lists were not marked confidential, and administrators as well as Mr. Crocicchia exchanged the lists that reflected which clients they were servicing. Moreover, when the lists were distributed, no effort was made to collect the lists. Client files were available to all employees. Files were routinely taken out of the office for work at home or to client meetings. Client files were sometimes left in the conference room, and routinely left in offices. Partial lists of clients were regularly sent to accountants, lawyers and prospective clients with no request for confidentiality.
Motor Vehicles
Despite demand Cole and Crocicchia have not returned the motor vehicles that were leased while they were employed at Heritage. The parties CT Page 2900 stipulated, however, that Cole and Crocicchia are co-lessees with Heritage and that they offered to return the cars in exchange for an agreement from Heritage to indemnify them. In the alternative, Mr. Cole and Mr. Crocicchia also agreed to keep the cars, indemnify Heritage and pay any back fees that are due.
 Discussion
I. Count One and Count Ten — Misappropriation of Trade Secrets.
The statutory framework governing misappropriation of trade secrets is set forth in the Uniform Trade Secrets Act, § 35-50 et. seq. of the Connecticut General Statutes.
A "trade secret", includes "information, including a . . . compilation, program. . . . cost data or customer list that: (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Conn. Gen. Stat. § 35-51 (d). Misappropriation means ". . . disclosure or use of a trade secret of another . . . by a person who . . . (B) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was . . . (ii) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use . . . or (iii) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use . . ." Conn. Gen. Stat. § 35-51 (b). The common law has created a body of law which is largely consistent with this statutory framework.
In the absence of a covenant not to compete, an employee is entitled to solicit his former employer's customers immediately after terminating employment if the names of the customers do not constitute a trade secret. Town Country House Homes Service, Inc. v. Evans, 150 Conn. 314,317-19 (1963). The court must therefore determine whether the names of the clients are a trade secret. Factors to consider include "(1) the extent to which the information is known outside the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and to his competitors; (5) the amount of effort or money expended by the employer in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." Id. at 319.
Where the identity of customers is readily ascertainable through CT Page 2901 ordinary business channels or through classified business or trade directories, then client names do not constitute a trade secret. Id. at 320.
In this case, defendants did not take or utilize any Heritage customer lists with them when they resigned from Heritage. Instead, based on their memories, defendants contacted these clients and offered the same services at the same rates that were being charged by Heritage. "The Restatement of Agency takes the position that an employee is ordinarily privileged to use the names of customers retained in his memory as a result of his normal employment activities in competing with his former employer, after termination of his employment. Restatement (second), Agency § 396. Most of the cases have supported this view." HolidayFood Co., Inc. v. Munroe, 37 Conn. Sup. 546, 555 (App. Sess. 1981) (Shea J. concurring).
Additionally, the names of Heritage clients are readily ascertainable by proper means by other people. The wealth of information that the Internet now provides to businesses precludes a finding that the information sought to be protected in this case should be considered a trade secret. Heritage client names, plan data, and contact names can be accessed through various means including entering the Heritage or actuary's name, or by searching for all employers which have filed a Form 5500 (which includes all Heritage customers) by town or state. All of the clients that were solicited and moved their business to defendants are listed on the Internet at Smartpage.com. Accordingly, the names of Heritage customers are readily ascertainable through legitimate and multiple means.
Plaintiffs also claim that the fees charged by Heritage are a trade secret. Defendants did not take records reflecting the Heritage fee schedules. This also is not a case where the defendants, knowing the fees charged by Heritage, sought to undercut their former employer. Instead, defendants told customers they would charge the same fees and provide the same services as Heritage, whatever they might be.[4] Finally, once the client name was legitimately known and contacted, the client was able to supply any information that the defendants needed regarding fees charged and services previously performed by Heritage.[5]
Plaintiffs also claim that defendants' knowledge of client's preferences for certain types of investments, goals regarding contribution ratios, desired diversification and fee tolerance constitute trade secrets. However, once the former employee legitimately had the name of a client, he could simply discuss with the client all of these issues. Additionally, the defendants' knowledge of the client's preferences regarding these issues is the type of general knowledge gained in CT Page 2902 employment that does not rise to the level of a trade secret. In essence, what the plaintiff is seeking to do is claim that all of an employee's general knowledge of the client gained through the employment relationship is a trade secret. This is not the law in Connecticut. Instead, if an employer needs to protect against a prior employee taking advantage of this type of general knowledge and positive relationship with clients, the employer should enter into a non-competition agreement with the employee.
Finally, the plaintiffs have not demonstrated by a preponderance of the evidence that they made sufficient efforts to maintain the secrecy of the information they are seeking to protect in this lawsuit. Heritage had no written confidentiality policies. The file cabinets were never locked, and all employees had access to them. Client lists were not marked "confidential", and administrators as well as Crocicchia were either given or had access to them. Moreover, when the lists were distributed, no effort was made to collect them. Files were routinely taken out of the office for work at home or to be taken to client meetings. Partial lists of clients were regularly sent to accountants, lawyers and prospective clients without any understanding as to confidentiality.
"The question of whether, in a specific case, a party has made reasonable efforts to maintain the secrecy of a purported trade secret is by nature a highly fact-specific inquiry." Elm City Cheese Co. v.Federico, 251 Conn. 59, 80 (1999). The court finds that in this case plaintiffs did not make reasonable efforts to maintain the secrecy of the alleged trade secrets.
II. Count Two-Breach of Contract
Plaintiffs allege in Count Two of the Amended Complaint that defendant Thomas Cole breached the non-compete provisions of his Employment Agreement.[6] The court finds that Heritage Benefit Consultants, Inc. materially breached the modified Employment Agreement by not providing Cole with stock as provided for in the Agreement or the value of the stock.[7] Because there was a material breach by the plaintiff, Cole is not bound by the non-compete provisions of the Employment Agreement.
Plaintiffs concede that the breach of an Employment Contract by an employer is a recognized defense to the enforcement of a non-complete agreement. (Plaintiff's Trial Brief, p. 27). See Custard InsuranceAdjusters v. Nardi, Connecticut Superior Court (Judicial District of Ansonia/Milford at Milford) (April 20, 2000); See Van Dyck Printing Co.v. DiNicola, 43 Conn. Sup. 191, 199 (1993), aff'd, 231 Conn. 272 (1994) [only where an employer is in material breach will enforcement be denied]; Bradley v. Health Coalition, Inc., 687 So.2d 329, 333 (Fla. 3d. CT Page 2903 Dist.Ct.App. 1997) [Employer's material breach by failing to pay earned commissions operates as a defense to enforcement of non-compete agreement]; Cornell v. T.V. Dev. Corp., 17 N.Y.2d 69, 75 (1966) [even a reasonably limited covenant not to compete is unenforceable if the employer has breached the employment agreement]. Plaintiffs also admit that Mr. Cole was owed either the stock certificates or the value of those stock certificates in the amount of three percent of the Company. Finally, plaintiffs admit that Mr. Cole never received the stock certificates or their value.[8]
The Employment Agreement provided in relevant part "[u]pon execution of this Agreement, Employee shall forthwith receive from the corporation three percent (3%) of all of the issued and outstanding capital stock of the Corporation as a one time signing bonus and the certificate for such shares shall be issued in the employee's name." This transfer never occurred despite repeated requests by Mr. Cole.
Section 241 of the Restatement (Second) of Contracts provides: "In determining whether a failure to render or to offer performance is material, the following circumstances are significant:
"(a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
"(b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
"(c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
"(d) the likelihood that the party failing to perform or to offer to perform will cure his failure taking account of all the circumstances including any reasonable assurances;
"(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing."
In reviewing the factors as set forth in the Restatement, it is clear that the stock provision of the Employment Agreement was materially breached by the plaintiff. Both Mr. Cole and Mr. Marciano testified during the trial that the stock provision was an important part of the Employment Agreement and Mr. Marciano admitted that Mr. Cole would not have signed the agreement without the stock provision. Seven years after the agreement was signed plaintiff had still not provided to Cole the stock. He was not treated as a stockholder and he did not enjoy any of CT Page 2904 the rights associated with being one. Finally, the evidence did not support a conclusion that plaintiff's failure to perform comported with a finding of good faith and fair dealing.
Plaintiffs claim that there was an oral modification of the Employment Agreement in 1997 whereby Cole agreed to accept the value of the stock in lieu of the actual stock certificates. For a valid modification to exist, there must be mutual assent to the meaning and conditions of the modification and the parties "must assent to the same thing in the same sense." (Internal quotation marks omitted.) Newman and Partners, P.C. v.CFC Construction Ltd., 236 Conn. 750, 762 (1996); Lar-Rob Bus Corp. v.Town of Fairfield, 170 Conn. 397, 402, 365 A.2d 1086 (1976). Modification of a contract maybe inferred from the attendant circumstances and conduct of the parties. See Rowe v. Cormier, 189 Conn. 371, 372-73, 456 A.2d 277
(1983); Malone v. Santora, 135 Conn. 286, 292, 64 A.2d 51 (1949). Whether the parties to a contract intended to modify the contract is a question of fact. Three S. Development Co. v. Santore, 193 Conn. 174, 177-78,474 A.2d 795 (1984); Rowe v. Cormier, supra, 189 Conn. 373.
Based on the testimony of both Mr. Cole and Mr. Marciano, the court finds that the parties agreed that Mr. Cole would be provided with the value of the shares and therefore there was a modification of the agreement.[9]
Marciano admitted that he still owed the value of the shares to Cole in the fall of 2000. Despite repeated requests to Marciano, Cole has still never received such value.[10] As a result, the court finds that plaintiff materially breached the Employment Agreement with defendant Cole. The plaintiff's breach deprived the defendant of a substantial benefit for which he had clearly bargained and reasonably expected. "It follows from an uncured material failure of performance that the other party to the contract is discharged from any further duty to render performances yet to be exchanged." Bernstein v. Nemeyer, 213 Conn. 665,672 (1990); Vesce v. Lee, 185 Conn. 328, 334 (1981); Silliman Co. v. S.Ippolito Sons, Inc., 1 Conn. App. 72, 75, (1983), cert. denied,192 Conn. 801 (1984); Aiello Construction, Inc. v. Nationwide TractorTrailer Training Placement Corporation, 122 R.I. 861, 864-65, 413 A.2d 85
(1980); 2 Restatement (Second), Contracts 237 (1981). Because plaintiff materially breached the Employment Agreement, Cole is not bound by the non-compete terms and was free to solicit clients and employees upon his resignation from Heritage.
III. Count Three-Negligence
Plaintiffs claim that defendants Cole and Crocicchia were negligent in that: CT Page 2905
(1) they used trade secrets of the plaintiffs;
(2) they damaged the plaintiffs by resigning without notice;
(3) they retained files;
(4) they failed to leave status reports;
(5) they contacted clients.
As discussed above, plaintiffs had the right to contact clients when they left the employ of Heritage and therefore they did not breach any duty. Additionally, as discussed above, they did not use any trade secrets in their new employment. The court also finds that defendants had no legal duty to give notice or leave status reports for their employer. With regard to the retention of files, the court finds that Mr. Crocicchia immediately delivered the work pending file back to Heritage upon realizing he still had it. There was no evidence that the plaintiff was damaged in any way by this oversight. With regard to the Jefferson Pilot files, the court finds that as a registered sales agent of Jefferson Pilot, he was required to maintain those files. Additionally, plaintiffs have not presented any evidence that they were damaged by his retention of these files. Plaintiffs have repeatedly stated that as a result of Mr. Crocicchia leaving they do not have anyone available to sell securities.
For all these reasons, plaintiffs have not sustained their burden of proof with regard to this cause of action.
IV. Counts Four and Five-Conversion and Theft.
The plaintiffs allege that defendants have wrongfully failed to return the leased automobiles, files and confidential information. As discussed above, defendants have not wrongfully retained any confidential information or files. With regard to the automobiles, defendants are co-lessees. Plaintiffs have not provided the court with any authority that they are any more entitled to possession of the cars than the defendants. Plaintiffs have therefore failed to sustain their burden of proof with regard to these counts.
V. Count Six and Count Ten — Unjust Enrichment.
Plaintiffs allege that the defendants were unjustly enriched because they began receiving profits in 1999 but ultimately did not purchase the Heritage companies.[11] To establish unjust enrichment, plaintiffs must CT Page 2906 demonstrate (1) that the defendants benefitted by receiving something of value; (2) that the benefit was unjust because the defendants did not pay the plaintiff for the benefit; and (3) that the failure of payment was to the plaintiff's detriment. Hartford Whalers Hockey Club v. UniroyalGoodrich Tire Co., 231 Conn. 276, 283 (1994).
At the outset it should be noted that there was no final agreement that the defendants would purchase the companies in exchange for the profit sharing arrangement. Plaintiffs have stipulated to this and have also stipulated that the defendants engaged in good faith negotiations until October 26, 2000. Additionally, the court finds that the profit sharing arrangement came about as a result of the defendants' dissatisfaction with the lack of time that Mr. Marciano was putting into the business and their statements that they would consider seeking alternative employment if a new arrangement could not be agreed to. Accordingly, plaintiffs did receive the benefit of defendants continuing to work for the Heritage companies for almost two more years after the profit sharing arrangement was entered into. Accordingly, plaintiffs have failed to satisfy the second element of an unjust enrichment theory.
VI. Count Seven — Breach of Fiduciary Duty.
Plaintiffs allege that Mr. Cole, as an officer and employee, breached his fiduciary duty to Heritage Benefit Consultants, Inc. The facts do not support this claim. The defendant did not compete with the plaintiffs prior to his resignation from Heritage. He fulfilled all of his responsibilities of employment while he was employed by Heritage and continued to do his job until his last day of employment. He did not take any documents with him upon his resignation. He did not contact any clients about switching their accounts to his new company until after he had resigned. Finally, he had the right to compete with Heritage after he resigned. For all these reasons, there is insufficient evidence to support a breach of fiduciary duty claim.[12]
VII. Count Nine — CUTPA Violation.
Plaintiffs allege that the defendants violated the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110 (b) et. seq. ("CUTPA").
"`(1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to CT Page 2907 consumers. . . .'" Id., 244n. A violation of CUTPA may also be established by showing either an actual deceptive practice or a practice amounting to a violation of public policy. Conaway v. Prestia,191 Conn. 484 (1983); Daddona v. Liberty Mobile Home Sales, Inc.,209 Conn. 243 (1988). The plaintiffs allege that the setting up of a competing business, alleged use of trade secrets and alleged violation of the Employment Agreement constitute CUTPA violations. For all the reasons previously discussed, defendants had the right to set up a competing business and did not violate the Employment Agreement or misappropriate trade secrets. Accordingly, defendants have not engaged in any unfair, unethical or deceptive practices and have not violated any public policy. Therefore, plaintiffs have not sustained their burden of proof with regard to this count.
VIII. Count Eleven-Tortious Interference.
The plaintiffs allege that defendants tortiously interfered with Heritage's contractual relationships. The elements of tortious interference are the existence of a contractual relationship, knowledge of that relationship, the intent to interfere with it, and the consequent actual loss suffered by the plaintiff. Hart, Nininger CampbellAssociates, Inc. v. Rogers, 16 Conn. App. 619, 628 (1988). For the plaintiffs to establish a claim, they must prove that the defendants' conduct was in fact tortious. Robert S. Weiss Associates, Inc. v.Wiederlight, 208 Conn. 525, 536 (1988). For all the reasons previously stated, defendants have not engaged in any tortious acts and therefore plaintiffs have not sustained their burden of proof with regard to this count.
 Conclusion
For all of the reasons stated above, plaintiffs' motions for a preliminary and permanent injunction are denied and Judgement shall enter in favor of the defendants on all counts of the Amended Complaint.
CHASE T. ROGERS SUPERIOR COURT JUDGE