SIDNEY R. BERNSTEIN ET AL. *v.* RONALD J.
NEMEYER ET AL.
(13823)

PETERS, C. J., SHEA, CALLAHAN, GLASS and COVELLO, Js.

Argued December 6, 1989—decision released February 13, 1990

*Alan R. Spirer,* with whom were *Nathan C. Nasser*
and, on the brief, *Karen Spirer,* for the appellants
(plaintiffs).

*Richard P. Weinstein,* for the appellees (defendants).

PETERS, C. J. The principal issue in this case is
whether investors in a speculative real estate venture
are entitled to rescission and restitution of their invest-
ments upon breach of a "negative cash flow guaranty"

contained in their partnership agreement. The plaintiffs[1] brought this action against the defendants Ronald J. Nemeyer and Cheshire Management Company, Inc., who are the general partners of CMC-Southwest Limited Partnership, to recover for the loss of the amounts that the plaintiffs, as limited partners, had contributed to the partnership. The complaint charged the defendants, in three counts, with breach of contract, willful misconduct and violation of the Connecticut Unfair Trade Practices Act, General Statutes § 42-110b. The defendants filed a number of special defenses, as well as a counterclaim for damages on a theory of indemnification. The trial court, after a hearing, ruled in the defendants' favor on the complaint, and in the plaintiffs' favor on the counterclaim. Only the plaintiffs have appealed, and their appeal challenges only the trial court's decision that they are not entitled to rescission and restitution on their claim of breach of contract. We find no reversible error in the judgment of the trial court.

The trial court found the following facts, which are undisputed. In 1983, the defendants and a group of investors known as the Class A limited partners formed the CMC-Southwest Limited Partnership (the partnership) to purchase and renovate two apartment complexes in Houston, Texas. During the summer of the following year, the defendants solicited the present plaintiffs, the Class B limited partners, to join the partnership. The plaintiffs were seeking an investment that would provide them with a source of capital growth as well as a tax deferral for sums generated by a takeover of the firm where they had been employed.

---

[1] In addition to Sidney R. Bernstein, the other plaintiffs are A. Douglas P. Craig, Robert Ableidiner, Fred L. Forni, B. J. Garet, Charles Gessner, Charles Huebner, Joseph A. Levato, Russell Mallett, Nicholas E. Sinacori, Donald Skelly, Edward D. Toole and Philip Wallach. These thirteen men comprise the totality of the Class B Limited Partners in the partnership at issue.

In their negotiations with the plaintiffs, the defendants described the objectives of the partnership as appreciation in the value of the Houston properties and federal income tax benefits in the form of deductions for the deferral of income. The defendants did not, however, conceal from the plaintiffs the risks of the partnership venture. The plaintiffs were on notice of the depressed state of the Houston real estate market in general. They were also informed of the particular vulnerability of the partnership properties to foreclosure, since the properties were fully leveraged, having been bought entirely with loans secured by mortgages.[2]

In three different documents, which the defendants drafted in August, 1984, in order to procure the plaintiffs' agreement to participate as limited partners, the defendants undertook to give a so-called negative cash flow guaranty to the partnership at least until December 31, 1988.[3] The defendants expressly agreed to lend to the partnership the amount by which operating expenses, debt service and capital expenditures exceeded cash receipts from the normal operations of the partnership.[4] Such loans were to be recoverable

---

[2] The plaintiffs have not alleged that the defendants wrongfully induced the plaintiffs' participation in the partnership, and they have not pursued, on appeal, the claim that the defendants engaged in willful misconduct in their performance of the partnership agreement. At trial, this latter claim was adjudicated in favor of the defendants.

[3] The three documents in which the defendants made reference to a negative cash flow guaranty were the First Amendment to Limited Partnership Agreement, the letter to the Class B limited partners and the Subscription Agreement.

[4] Paragraph 9 of the First Amendment to Limited Partnership Agreement provides: "[T]he General Partners agree to loan to the Partnership the amount by which operating expenses (but without deduction for depreciation), debt service and capital expenditures with respect to Partnership property exceed the sum of cash receipts from normal operations of the Partnership (including, without limitation, rent payments under leases of apartments comprising the Property) and capital contributions received by the Partnership."

The letter to the Class B limited partners provides in part: "In the event the Partnership experiences negative cash flows at any time during the

either from operating income or from proceeds received upon disposition of the properties, but in the latter event only after all the plaintiffs had been repaid their capital contributions.[5]

Although the plaintiffs invested $1,050,000 in the partnership, the partners' hopes for appreciation of the Houston properties did not materialize. The defendants lent $3,000,000 to the partnership by virtue of the negative cash flow guaranty but discontinued mortgage payments in November, 1985, in an unsuccessful effort to renegotiate the financial terms of the mortgages. The defendants' attempt thereafter to find shelter under the bankruptcy laws proved equally unsuccessful. The mortgagees foreclosed on the properties in the summer of 1987. Both the plaintiffs and the defendants lost their entire investments. This lawsuit ensued.

period ending December 31, 1988, CMC will lend to the Partnership funds in an amount equal to such negative cash flows, it being understood and agreed that CMC shall be obligated to make such loans from time to time on a monthly basis during said period."

The Subscription Agreement provides in part: "The General Partners have agreed to lend the Partnership an amount equal to negative cash flows experienced from Partnership operations through December 31, 1988."

[5] The letter to the Class B partners provides in part: "Each such loan will bear simple interest at the prime rate of interest established, from time to time, by Citibank N.A. and will be payable to CMC out of Partnership operating income (to the extent such income is positive at the time of such repayment) or, if not paid from such operating income, then from the proceeds of the sale, refinancing or other disposition of the Properties (but only after all Partners have been repaid their capital contributions from the proceeds of all sales, refinancings or other Property dispositions). Interest on such loans will only be payable from such sale, refinancing or other Property disposition proceeds."

The Subscription Agreement provides in part: "The principal amount of these loans may be repaid from positive cash flows resulting from Partnership operations, although the interest on such loans (calculated at the prime rate established from time to time by Citibank N.A.) will be repaid to the General Partners from funds resulting from the sale or refinancing of the Properties after all of the General and Limited Partners have received from all distributions of funds resulting from sales or refinancings an amount equal to their initial cash contributions to the capital of the Partnership."

The trial court denied the plaintiffs' request for rescission and restitution of their $ 1,050,000 investment. The court found that the plaintiffs had bargained for the negative cash flow guaranty and that the defendants' failure to make mortgage payments in 1985 was a breach of that guaranty.[6] The court determined nonetheless that the plaintiffs could not recover for three reasons: (1) the guaranty was an incidental rather than a central term of the contract as a whole, and the defendants' nonperformance therefore was not a material breach warranting rescission; (2) the losses suffered by the plaintiffs resulted not from the defendants' breach but from the continued failure of the Houston real estate market; and (3) despite the defendants' breach, the plaintiffs had realized the tax benefits that were a central part of their bargain.

The plaintiffs' appeal challenges these adverse conclusions of the trial court and reasserts a right to rescission and restitution. We agree with the plaintiffs that the defendants' nonperformance of the negative cash flow guaranty was sufficiently material to the contract that the trial court erred in denying rescission to the plaintiffs on that ground. Because the remedy of restitution consequent to rescission requires a showing of unjust enrichment, however, the judgment of the trial court can be sustained on the alternate ground that the plaintiffs have failed to demonstrate unjust enrichment in this case. See *Aetna Casualty & Surety Co.* v. *Murphy,* 206 Conn. 409, 420, 538 A.2d 219 (1988); *Favorite* v. *Miller,* 176 Conn. 310, 317, 407 A.2d 974 (1978).

I

We first consider whether the trial court was mistaken in concluding that the plaintiffs were not entitled

---

[6] At trial, the defendants also asserted a defense of impossibility, which the trial court rejected. The defendants have not pressed this claim on appeal.

to rescission because they had failed to prove a material breach of the partnership agreement. This underpinning for the trial court's judgment cannot be sustained.

The trial court found that the defendants' breach of the negative cash flow guaranty was an incidental rather than a material breach. This finding was clearly erroneous in light of the evidence and the pleadings in the record as a whole. Practice Book § 4061; *Pandolphe's Auto Parts, Inc.* v. *Manchester,* 181 Conn. 217, 221, 435 A.2d 24 (1980). Several of the plaintiffs, as well as the named defendant, testified that the plaintiffs had bargained for the negative cash flow guaranty because of their concern about the quality of the Houston properties and the overall status of the Houston real estate market.[7] There was no testimony that the

[7] Several of the plaintiffs' testimony directly addressed the centrality of the negative cash flow guaranty to the agreement. These plaintiffs testified as follows:

Testimony of Fred L. Forni:

"Q. Mr. Forni, you were aware, as you just stated to counsel, the properties were operating at a deficit, that they were leveraged, that they could be foreclosed and that they were operating at a high vacancy rate. Were all these factors important to you in negotiating the negative cash flow guaranty?

"A. Crucially important. That's what made it so important."

Testimony of Nicholas E. Sinacori:

"Q. Were you aware of the fact that CMC-Southwest Limited Partnership was experiencing severe problems in terms of vacancy after you invested?

"A. Yes.

"Q. And you were aware of the fact that this was a turnaround situation so-called or, at least, the hope and expectation of a turnaround?

"A. That's why we required the cash flow guaranty.

"Q. And the cash flow guaranty was to run through December 31, 1988, is that correct?

"A. That is what we were bargaining for, yes."

Testimony of Sidney R. Bernstein:

"Q. You negotiated with Mr. Nemeyer a five-year negative cash flow guaranty; is that correct?

plaintiffs would have been willing to invest in the partnership in the absence of this guaranty. The various documents detailing the terms of the partnership agreement were all drafted by the defendants, and each contained such a guaranty. The terms of the guaranty differed, in the various documents, only insofar as there was some question about whether the guaranty extended beyond December 31, 1988. Since the defendants' breach occurred in November, 1985, this discrepancy was of minimal importance, and the trial court so found.

It is no answer to this unequivocal factual showing to point to the plaintiffs' interest in the partnership as a vehicle for tax deferral as well as for capital appreciation. The United States Supreme Court held, in *Randall* v. *Loftsgaarden,* 478 U.S. 647, 662–64, 106 S. Ct. 3143, 92 L. Ed. 2d 525 (1986), that the receipt of tax benefits does not per se justify the denial of access to the remedy of rescission, when that remedy is other-

---

"A. Yes.

"Q. And that was you felt to be an important part of the bargain you were making with Cheshire Management Company?

"A. Yes."

Likewise, the named defendant testified as follows:

"Q. Did there come a time prior to their investment in CMC-Southwest that there were discussions about a negative cash flow guaranty?

"A. To my best recollection, they first came up after that gentleman, who has been referred to, had made his trip to Houston to inspect the properties. And I believe I remember [sitting] with him at lunch at the U.S. Industries' cafeteria. I know we went through the cafeteria line together, and it was clear to me, you know, that he was concerned about the quality of the properties, because they certainly weren't what we would call top quality or Class A apartment properties. And it was, I believe, as a result of his input they were getting concerned about how much work had to be done on the properties and the overall status of the Houston market itself, and as a result of those efforts there was then much discussion of a negative cash flow guaranty stemming from, I think, that inspection. . . .

"Q. The fact of the matter is you agreed to the negative cash flow guaranty, and it was your impression that it would last until December 31, 1988?

"A. That's true."

wise warranted. Moreover, the prospects for both the tax deferral and the capital appreciation depended upon the partnership's viability over the long term, and that was precisely the object of the negative cash flow guaranty. There was no testimony to the contrary.

The trial court correctly looked to the multi-factor standards for materiality of breach contained in the Restatement (Second) of Contracts § 241 (1981)[8] but failed to apply those standards correctly. In the circumstances of this case, the most important factors are that the defendants' breach deprived the plaintiffs of a substantial benefit for which they had clearly bargained and which they had every reason to expect, and that the defendants' breach was totally incurable, the partnership having lost all control over its Houston properties. That the defendants conducted the affairs of the partnership in good faith does not, on this record, make their breach immaterial or incidental.

## II

The conclusion that the defendants' nonperformance of the negative cash flow guaranty was a material breach of the partnership agreement does not, however, end our inquiry. It follows from an uncured material failure of performance that the other party to the

[8] Section 241 of the Restatement (Second) of Contracts provides: "In determining whether a failure to render or to offer performance is material, the following circumstances are significant:

"(a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;

"(b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

"(c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

"(d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

"(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing."

contract is discharged from any further duty to render performances yet to be exchanged. *Vesce* v. *Lee,* 185 Conn. 328, 334, 441 A.2d 556 (1981); *Silliman Co.* v. *S. Ippolito & Sons, Inc.,* 1 Conn. App. 72, 75, 467 A.2d 1249 (1983), cert. denied, 192 Conn. 801, 470 A.2d 1218 (1984); *Aiello Construction, Inc.* v. *Nationwide Tractor Trailer Training & Placement Corporation,* 122 R.I. 861, 864–65, 413 A.2d 85 (1980); 2 Restatement (Second), Contracts § 237 (1981).[9] It does not follow that the party so discharged is automatically entitled to restitution rather than to a claim for damages.[10] We must still determine whether, in the circumstances of this case, the trial court correctly rendered judgment in favor of the defendants because the plaintiffs have failed to prove a right to restitution of the payments that they made to the partnership. We conclude that the record sustains the judgment of the trial court on this alternate ground.

"When a court grants [the remedy of restitution] for breach, the party in breach is required to account for a benefit that has been conferred on him by the injured party. . . . In contrast to cases in which the court grants specific performance or awards damages as a remedy for breach, the effort is not to enforce the promise by protecting the injured party's expectation or reliance interest, but to prevent unjust enrichment of the party in breach by protecting the injured party's restitution interest. The objective is not to put the *injured* party in as good a position as he would have been in

---

[9] Section 237 of the Restatement (Second) of Contracts provides in pertinent part: "[I]t is a condition of each party's remaining duties to render performances to be exchanged under an exchange of promises that there be no uncured material failure by the other party to render any such performance due at an earlier time."

[10] The plaintiffs have never asserted, and the trial court therefore did not address, any claim for expectancy damages resulting from the breach of contract.

if the contract had been performed, nor even to put the *injured* party back in the position he would have been in if the contract had not been made; it is, rather, to put the party *in breach* back in the position he would have been in if the contract had not been made." (Emphasis in original.) E. A. Farnsworth, Contracts (1982) § 12.19, p. 905; 1 G. Palmer, The Law of Restitution (1978) § 4.1, p. 369; 3 Restatement (Second), Contracts §§ 344 (c) and 370 (1981);[11] and see *Monarch Accounting Supplies, Inc.* v. *Prezioso,* 170 Conn. 659, 665–67, 368 A.2d 6 (1976); *Franks* v. *Lockwood,* 146 Conn. 273, 278, 150 A.2d 215 (1959). When an injured party seeks an award of money to protect his restitutionary interest, any award "may as justice requires be measured by either (a) the reasonable value to the other party of what he received . . . or (b) the extent to which the other party's property has been increased in value or his other interests advanced." 3 Restatement (Second), Contracts § 371 (1981).[12]

The principles of the law of restitution demonstrate that the defendants' nonperformance of the negative cash loan guaranty, although a material breach of the partnership agreement, does not automatically and

---

[11] Section 344 of the Restatement (Second) of Contracts provides in relevant part: "Judicial remedies under the rules stated in this Restatement serve to protect one or more of the following interests of a promissee . . . .

"(c) his 'restitution interest,' which is his interest in having restored to him any benefit that he has conferred on the other party."

Section 370 provides: "A party is entitled to restitution under the rules stated in this Restatement only to the extent that he has conferred a benefit on the other party by way of part performance or reliance."

[12] Section 371 of the Restatement (Second) of Contracts provides: "If a sum of money is awarded to protect a party's restitution interest, it may as justice requires be measured by either

"(a) the reasonable value to the other party of what he received in terms of what it would have cost him to obtain it from a person in the claimant's position, or

"(b) the extent to which the other party's property has been increased in value or his other interests advanced."

unconditionally entitle the plaintiffs to recover their investment in the partnership. The award of a restitutionary remedy for breach of contract depends upon a showing of what justice requires in the particular circumstances. *Metcalfe* v. *Talarski,* 213 Conn. 145, 153–54, 567 A.2d 1148 (1989); *Maruca* v. *Phillips,* 139 Conn. 79, 83, 90 A.2d 159 (1952); *Milford Yacht Realty Co.* v. *Milford Yacht Club, Inc.,* 136 Conn. 544, 549, 72 A.2d 482 (1950); *Caramini* v. *Tegulias,* 121 Conn. 548, 553–54, 186 A. 482 (1936); *Kavarco* v. *T.J.E., Inc.,* 2 Conn. App. 294, 299–300, 478 A.2d 257 (1984). The decision to award a particular restitutionary remedy thus necessarily rests in the discretion of the court.

In the present litigation, the trial court could reasonably have concluded that the plaintiffs had failed to establish their right to the return of their investments. We have regularly held that it is a condition of rescission and restitution that the plaintiff offer, as nearly as possible, to place the other party in the same situation that existed prior to the execution of the contract. *Metcalfe* v. *Talarski,* supra; *Duksa* v. *Middletown,* 192 Conn. 191, 197, 472 A.2d 1 (1984); *Keyes* v. *Brown,* 155 Conn. 469, 476, 232 A.2d 486 (1967); *Kavarco* v. *T.J.E., Inc.,* supra, 299. The record in this case is entirely unclear about what efforts the plaintiffs made to tender back their partnership interests to the defendants before bringing this lawsuit.[13] The record likewise contains no finding that the financial condition of the part-

[13] There was testimony at trial that, in the summer of 1986, at a meeting of two of the plaintiffs with the named defendant, the plaintiffs informally offered to tender the partnership interests of the Class B limited partners to the defendants in return for repayment of the total investments made by those partners. The named defendant, however, testified that the plaintiffs had never offered to sell back their interest to the defendants. The trial court did not resolve this factual disagreement. The plaintiffs did not ask the trial court to make a definitive finding on this issue in the motion for articulation that they filed on other grounds.

nership, at the time the plaintiffs learned of the defendants' breach, was already so impoverished that a restitutionary tender would have been pointless.

Even more damaging to the plaintiffs' claim for restitution is the trial court's affirmative finding that the defendants "suffered a great loss of their own, about three million dollars, in attempting to satisfy their obligations under the contract and, specifically, the guaranty provision." This unchallenged finding of fact supports the conclusion that the plaintiffs could not have restored the defendants to their position prior to their execution of the partnership agreement. Further, it demonstrates that, despite the defendants' material breach of the partnership agreement, the defendants' property interests have not been "increased in value or [their] other interests advanced." 3 Restatement (Second), Contracts § 371 (b) (1981). In short, the plaintiffs have not proven that the defendants have been unjustly enriched.

There is no error.

In this opinion the other justices concurred.