DONALD F. REID *v.* DIANA SEBASTIAN
LANDSBERGER ET AL.
(AC 30472)

Bishop, Gruendel and Beach, Js.

Argued December 7, 2009—officially released August 17, 2010

*G. Randall Avery,* for the appellant (named defendant).

*Joseph C. Ventricelli,* with whom, on the brief, was *John A. Milici,* for the appellees (defendant Julio Traslavina et al.).

*Opinion*

BEACH, J. In this interpleader action,[1] the defendant Diana Sebastian Landsberger appeals from the trial court's judgment rendered in accordance with the report of an attorney trial referee (referee). The court rendered judgment awarding the other defendants, Julio Traslavina and Maria Traslaviña, $63,500 as liquidated damages for Landsberger's default under the terms of a contract for the sale of real property.[2] On appeal, Landsberger claims that the court improperly (1) found that there was a meeting of the minds between the parties and, thus, a contract was formed, (2) concluded that Landsberger breached the residential real

---

[1] This action was commenced by the plaintiff, Donald F. Reid, as the holder of a $63,500 escrow deposit made by the defendant Diana Sebastian Landsberger in connection with the underlying real estate transaction here in dispute. The plaintiff sought and was granted an interlocutory judgment requiring the defendants to interplead concerning their claims to the funds so that the court could order the plaintiff to give the funds to the proper party and be released of any further obligations or liabilities.

[2] Paragraph 16 of the contract provides in relevant part: "If BUYER is in default hereunder, or, on or before the date of closing as set forth herein, indicates that BUYER is unable or unwilling to perform and SELLER stands ready to perform SELLER's obligations, SELLER's sole and exclusive remedy shall be the right to terminate this Agreement by written notice to BUYER or BUYER's attorney and retain the down payment as reasonable liquidated damages for BUYER's inability or unwillingness to perform. . . ."

estate sales agreement (agreement) when she repudiated the agreement on the basis of the presence of wetlands on the property, (3) concluded that the sellers, the Traslavinas, did not breach the agreement when they represented to Landsberger that they had obtained the proper building permit and certificate of occupancy regarding the rear deck and (4) referred the case back to the same referee after having rejected that referee's first report. We reverse, in part, the judgment of the trial court and remand the case for further proceedings.

The following facts and procedural history are relevant to our resolution of these issues. In June, 2006, Landsberger, as the buyer, and the Traslavinas, as the sellers, entered into an agreement by which Landsberger was to purchase the Traslavinas' home located at 41 Arlington Road in Stamford. The plaintiff, Donald F. Reid, as counsel for the Traslavinas, prepared a contract to reflect the terms of the proposed sale and sent it to Harold F. Bernstein, counsel for Landsberger. This draft of the contract included a residential property condition disclosure report (report) pursuant to General Statutes § 20-327b. On the report, the Traslavinas indicated that the property did not contain any wetlands. The report states that all answers are certified by the Traslavinas "[t]o the extent of the Seller's knowledge . . . ." It also states that the Traslavinas' representations do "not constitute a warranty to the buyer" and that the report "is not a substitute for inspections, tests, and other methods of determining the physical condition of the property."

The agreement specifically referred to the report and stated that it was attached as a rider. On the same page, the contract also included paragraph 26 entitled "Representations." This paragraph states: "Unless otherwise specified in writing to the contrary, none of the representations made in this Agreement including all Attachments shall survive delivery of the deed and all

representations by SELLER are made to the best of SELLER's knowledge and belief. Further, said representations shall be as true and accurate at the time of closing as they were as of the date hereof. Except in the event of an intentional misrepresentation, if Purchaser discovers any material representation contained in this Agreement including all Attachments to be untrue or inaccurate, the remedy of the parties shall be those available to them in the event of a valid defect in or objection to title." The contract also provided that if the seller could not produce a good and marketable title to the property, "then the SELLER shall be allowed a reasonable postponement of closing not to exceed thirty (30) days . . . within which to perfect title. If at the end of said time the SELLER is still unable to deliver or cause to be delivered a deed or deeds conveying a good and marketable title to said Premises . . . then the BUYER (i) may elect to accept such title as the SELLER can convey, without modification of the purchase price, or (ii) may reject such title. Upon such rejection, all sums paid on account hereof, together with any expenses actually incurred by the BUYER for attorneys' fees, nonrefundable fees of lending institutions, survey costs and inspection fees (the total cost of which shall not . . . exceed the cost of fee title insurance based on the amount of the purchase price) shall be paid to the BUYER without interest thereon. Upon receipt of such payment, this Agreement shall terminate and the parties hereto shall be released and discharged from all further claims and obligations hereunder."

Upon receiving the agreement, Bernstein contacted Reid to discuss certain changes he wanted made to it, including the inclusion of an additional rider. Reid agreed to the terms Bernstein proposed and agreed to the rider. The rider included a provision entitled "Certificate of Occupancy," which states: "The Seller

represents that during the period of his ownership a building permit and final Certificate of Occupancy were obtained whenever required for work done on the premises (including, but not limited to the Trex deck located at the rear of [the] premises) and that the Seller will provide Buyer with a copy of the Certificate of Occupancy at closing." On June 14, 2006, Bernstein forwarded to Reid the new agreement signed by Landsberger. She also included her deposit of $63,500 with her signed agreement. On June 19, 2006, the Traslavinas signed the agreement. On June 21, 2006, Landsberger and the Traslavinas agreed to extend the date for resolution of the inspection contingency for radon, described in paragraph K of the rider.

Bernstein contacted Reid on June 20, 2006, after receiving the fully signed agreement, to discuss the terms of the deed restrictions referenced in the formal property description on schedule A. Reid informed Bernstein that he did not have a copy of the deed containing the restrictions. Bernstein obtained a copy of the restrictions and faxed it to Reid on June 21, 2006. The restrictions referred to the maintenance of a brook. This brook was no longer located on the property, but the reference caused Bernstein to be concerned that wetlands might be present on the property. On June 21, 2006, after discussing these concerns with Reid, Bernstein faxed him a letter stating that Landsberger intended to investigate the issue of wetlands and that Reid had agreed to inquire whether the Traslavinas were aware of any wetlands on the property. Bernstein advised Reid that if the investigation indicated that there was a flood or wetland condition, his client did not intend to proceed with the sale and would seek a return of her deposit.

Reid responded to Bernstein's letter by fax on the same day. He stated that the Traslavinas were not aware of any stream or wetlands on the property and that

they did not have flood insurance. He provided the name of their insurer and agreed to provide the policy information at a later date. Bernstein then conducted a "municipal search" of the property and reviewed the records held by the city of Stamford environmental protection board. His investigation revealed that a 1997 wetlands report and a 1997 engineer's map showed the existence of wetlands in a corner of the property. As a result, Bernstein wrote to Reid on June 30, 2006, seeking to terminate the contract because of the presence of wetlands on the premises. On the same day, Bernstein sent Reid another letter stating that his investigation also revealed that no building permit or certificate of occupancy had been obtained for work performed by the Traslavinas on the deck. Landsberger did not offer to extend time to cure the defect, and the Traslavinas did not request time. On July 5, 2006, the date set for closing passed. Reid commenced this interpleader action on August 16, 2006. The Traslavinas obtained a building permit and certificate of occupancy for the deck just prior to the start of the second trial in 2008.

On May 4 and 9, 2007, the referee conducted the first trial in this matter. With the consent of the parties, he did not provide a ruling within the 120 day period within which a referee is to issue a finding pursuant to Practice Book § 19-4. Therefore, the court sustained Landsberger's objection to the acceptance of the referee's report. The court then issued a supplemental order referring the matter back to the same referee.

The referee held a second trial on March 23 and April 2, 2008. At trial, Landsberger and Julio Traslavina testified that the presence of wetlands on the property would be an important condition to them. Bernstein testified that "it is extremely difficult, nearly impossible, to change wetlands designations because wetlands don't come and go." Reid testified that the wetlands

condition is "a curable situation—perhaps. . . . [W]ithin the cure period, he could have gotten a soil scientist to certify [that wetlands no longer existed on the property]." The referee issued his report on August 20, 2008, recommending that judgment enter in favor of the Traslavinas. Landsberger objected to the acceptance of the referee's report. The court issued a memorandum of decision filed October 16, 2008, accepting the referee's report in its entirety. In its judgment file, issued the same date, the court ordered that the Traslavinas retain the $63,500 deposit and recover statutory costs from Landsberger. This appeal followed.

## I

Landsberger first claims that the court improperly determined that a contract existed. She asserts that there was no meeting of the minds because "both the sellers and the [purchaser] were factually mistaken as to two important issues at the time of entering the contract—the presence of a large area of wetlands regulation on the premises, and the lack of both a permit and a certificate of occupancy for the large rear deck on the property." We disagree.

As a preliminary matter, we begin by setting forth our standard of review. "The existence of a contract is a question of fact to be determined by the trier on the basis of all of the evidence. . . . To the extent that the [trier of facts] has made findings of fact, our review is limited to deciding whether such findings were clearly erroneous. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . In making this determination, every reasonable presumption must be given in favor of the trial court's ruling." (Internal quotation marks omitted.)

*Rissolo* v. *Betts Island Oyster Farms, LLC,* 117 Conn. App. 344, 355–56, 979 A.2d 534 (2009).

The court found that a contract did exist. "In order for an enforceable contract to exist, the court must find that the parties' minds had truly met. . . . If there has been a misunderstanding between the parties, or a misapprehension by one or both so that their minds have never met, no contract has been entered into by them and the court will not make for them a contract which they themselves did not make." (Internal quotation marks omitted.) *Rosenblit* v. *Laschever,* 115 Conn. App. 282, 288, 972 A.2d 736 (2009). The court concluded that the parties did have a meeting of the minds. Because the agreement existed in written form and was signed by all parties, Landsberger's argument that a meeting of the minds did not occur is not supported by the evidence, at least where there is no mutual mistake as to the fundamental promises. See *Tsionis* v. *Martens,* 116 Conn. App. 568, 577–78, 976 A.2d 53 (2009). The fact that the parties to the contract may have been mistaken as to some of the problems involving wetlands and the deck does not prevent the contract from having been formed; indeed, the contract specifically recognized that issues as to wetlands, for example, could arise, and provisions of the contract addressed that contingency. See *669 Atlantic Street Associates* v. *Atlantic-Rockland Stamford Associates,* 43 Conn. App. 113, 124, 682 A.2d 572, cert. denied, 239 Conn. 949, 950, 686 A.2d 126 (1996). The fundamental terms, identity of parties, premises conveyed and price, were agreed to.

II

Landsberger next claims that the court erroneously determined that she breached the real estate agreement and that the Traslavinas had not breached the agreement. The fundamental terms of a real estate contract are an exchange of promises: typically, the buyer

promises to pay a sum of money on the closing date and the seller agrees to convey title to the subject property at the same time. See 14 R. Powell & P. Rohan, Powell on Real Property (2009) § 81.01, p. 81-6. The contract governs the rights and duties of the parties during the period of time between the formation of the contract and its execution, when the deed is conveyed and the money paid. Id., § 81.01, pp. 81-6 through 81-8. The terms of the contract typically do not survive the conveyance of the deed.

The contract provides the purchaser with an opportunity to ensure that the title, and the property it represents, are what the purchaser had bargained for. For example, the contract may provide a time in which the purchaser may inspect the property for defects; if the inspection reveals defects, and the defects are correctible within a reasonable period of time, mechanisms for correction are available at or before the time of the closing. Similarly, time typically is allowed for investigation into defects in title. If title is unmarketable, then the purchaser is discharged from his or her obligations under the contract. If a defect in title can be cured, time is allowed accordingly. The period of time between reaching the agreement and finalizing the transaction by the full payment of the purchase price and the conveyance of the deed is aptly used so that the fundamental agreement of the parties can be finalized. Once the exchange is made at the closing, adjustments for defects and for claims that the parties did not get what they bargained for are far more difficult to pursue. With the exception of a small range of actions such as fraudulent misrepresentation, only the warranties appearing in the deed may provide a remedy. See generally id., §§ 81-02 and 81-03.

Here, as in the typical contract, the parties contemplated a period of time in which problems could be

identified and addressed. In order to facilitate communication and to avoid future litigation, our General Assembly has provided for a list of representations made by the seller to be appended to real estate contracts. General Statutes § 20-327b et seq.; see *Giametti* v. *Inspections, Inc.*, 76 Conn. App. 352, 360, 824 A.2d 1 (2003). A statement pursuant to § 20-327b is made only to the best of the seller's knowledge and is specifically not a warranty. The statement does, however, cover various conditions and invites the purchaser to investigate further. Nothing prevents the parties from adding provisions to the statement.

If the purchaser discovers a defect, in condition or in title, such that the § 20-327b statement is inaccurate, there are several possible options. If the defect is incurable, then the purchaser, who is unable to receive what he or she has bargained for, has the power to terminate the contract and to seek restitution so that the parties are returned to the positions they were in before they entered into the contract. See, e.g., *Metcalfe* v. *Talarski*, 213 Conn. 145, 153, 567 A.2d 1148 (1989); 14 R. Powell & P. Rohan, supra, § 81.03 [6] [f], p. 81-151. If the defect is curable, then the seller is given a reasonable time to cure. The contract itself may provide specific guidelines and consequences, including the purchaser's right to rescind. 14 R. Powell & P. Rohan, supra, § 81.04 [3] [c], p. 81-198. It is sound policy to encourage adjustments prior to the closing, when the parties' intent may be actualized and disputes minimized. After the closing, the interest in finality gains importance.

The agreement in question, read together with the § 20-327b report and undisputed facts, provides the following factual scenario. The Traslavinas represented, though only to the best of their knowledge, that the property was not in a flood plain and contained no wetlands. During the prescribed period for investigation, Landsberger determined that the representation

was not accurate. Almost immediately upon discovery, she notified the Traslavinas, through attorneys, that she wanted to rescind the contract and to have her deposit returned. The Traslavinas refused. Landsberger did not wait for the contractual time in which to cure the defect to expire before repudiation, and the Traslavinas did not request the opportunity to cure. Landsberger's attorney testified that the existence of wetlands on the property could not have been cured within the thirty day cure period. The Traslavinas' attorney testified that the wetlands designation perhaps could have been cured within the thirty day cure period.

On the facts found by the referee, the court affirmed the referee's conclusion that the Traslavinas' misrepresentation was not material and that Landsberger's repudiation effectively breached the agreement. We disagree with the finding that the misrepresentation was not material. We cannot determine whether Landsberger's repudiation effectively breached the agreement because the referee did not make a finding as to whether the wetlands designation could have been cured within the cure period.

"When a party asserts a claim that challenges the trial court's construction of a contract, we must first ascertain whether the relevant language in the agreement is ambiguous. . . . A contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself. . . . [W]here there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law. . . . Because a question of law is presented, review of the trial court's ruling is plenary, and this court must determine whether the trial court's conclusions are legally and logically correct, and whether they find support in the facts appearing in the record. . . .

"The intent of the parties as expressed in a contract is determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. . . . [T]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract. . . . Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms. A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity . . . . Similarly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms." (Citations omitted; internal quotation marks omitted.) *WE 470 Murdock, LLC* v. *Cosmos Real Estate, LLC*, 109 Conn. App. 605, 608–609, 952 A.2d 106, cert. denied, 289 Conn. 938, 958 A.2d 1248 (2008). We also construe contractual language in such a way so that, if possible, no term is superfluous or ineffective. See *Honulik* v. *Greenwich*, 293 Conn. 698, 711, 980 A.2d 880 (2009).

The rights and duties of the parties were governed by the contract. The contract provided that "if Purchaser discovers any material representation contained in [the] Agreement including all Attachments to be untrue or inaccurate, the remedy of the parties shall be those available to them in the event of a valid defect in or objection to title." If there were a valid defect in title, the contract provided that the seller "shall be allowed a reasonable postponement of closing not to exceed thirty (30) days . . . within which to perfect title. If at the end of said time [the defect is not cured], the BUYER . . . may reject such title."

We conclude that the language of the agreement is clear and unambiguous, and accordingly, it presents a question of law subject to plenary review. The court improperly employed the language of § 241 of the Restatement (Second) of Contracts, which is applicable to situations in which a party seeks to rescind a contract because of another's material breach.[3] See 2 Restatement (Second), Contracts § 241, p. 237 (1981). Particular considerations as to whether a *breach* is material may be different from considerations as to whether a *representation* in a contract is material. In construing language in a contract, we seek to ascertain and to give effect to the intent of the parties, and we apply ordinary meanings to the words used. The ordinary meaning of "material" is "[o]f such a nature that knowledge of the item would affect a person's decision-making process"; Black's Law Dictionary (7th Ed. 1999); the ordinary meaning does not necessarily implicate the various factors set forth by the authors of the Restatement in providing guidelines for courts to use in determining whether a breach can justify rescission.

Because the parties specifically provided for remedies in the contract for the sale of real estate and the language of the contract is clear, the court's conclusions regarding the application of the Restatement provisions are clearly erroneous. As in *Bernstein* v. *Nemeyer*, 213 Conn. 665, 669, 570 A.2d 164 (1990), the term—in that case, the covering of negative cash flow by the defendants—is, by the language of the agreement and the context of the business arrangement, deemed to be important.[4]

---

[3] We note that the policy factors enumerated in § 241 of the Restatement (Second) of Contracts aptly apply to executed contracts. The real estate contract, temporary in nature and specifically contemplating adjustments, presents different considerations. 2 Restatement (Second), supra, § 241.

[4] *Bernstein* recognized the applicability of § 241 of the Restatement; *Bernstein* v. *Nemeyer*, supra, 213 Conn. 672; but in light of the undisputed facts in that case held that the finding of the trial court that the breach was not material was clearly erroneous. Id., 670.

Both sides seek to rely on *669 Atlantic Street Associates* v. *Atlantic-Rockland Stamford Associates*, supra, 43 Conn. App. 113. That case provides little help in this instance to either side. The seller in *669 Atlantic Street Associates* had made a representation that to the best of its knowledge, as of the closing, there were no conditions on the property in violation of law or governmental regulation and that any hazardous waste on the property would be managed according to applicable laws and regulations. Id., 116. In the course of the transaction, a dispute arose about the seller's performance of its obligations concerning the environmental condition of the property and the presence and extent of environmental contamination. Id., 117. The trial court engaged in an analysis under § 241 of the Restatement. This court noted that because the parties had clearly contemplated that the premises might indeed contain hazardous waste and had made provisions for that contingency in the contract, the inaccuracy of the representation could not, in those circumstances, provide the basis for a breach. Because of the language of the contract and the context, the breach, if any, could not be material. Applied to the facts of this case, then, *669 Atlantic Street Associates* is of little help to either side.

Our statutes and case law provide some guidance as to the restrictions placed on property contained within regulated wetlands areas. A wetlands designation prevents a landowner from doing any regulated activity within a wetland or the upland review area[5] around the wetland without a permit. General Statutes § 22a-42a (c) (1). A regulated activity is defined as "any operation within or use of a wetland or watercourse involving

---

[5] "An upland review area is a nonwetland or nonwatercourse area in which an inland wetland commission may regulate activities that are likely to affect or to impact wetlands or watercourses. Those are also known as buffer zones or setback areas." *Prestige Builders, LLC* v. *Inland Wetlands Commission*, 79 Conn. App. 710, 712 n.3, 831 A.2d 290 (2003), cert. denied, 269 Conn. 909, 852 A.2d 739, 740 (2004).

removal or deposition of material, or any obstruction, construction, alteration or pollution, of such wetlands or watercourses . . . ." General Statutes § 22a-38 (13). A landowner who wants to conduct any regulated activity within a wetland must file an application with the inland wetlands agency of the town or towns in which the wetland is located. General Statutes § 22a-42a (c) (1). The inland wetlands agency will then grant or deny the landowner's application after considering the factors set forth in General Statutes § 22a-41. General Statutes § 22a-42a (d). These restrictions place a burden on landowners who want to make improvements to a parcel of land containing wetlands. See *Queach Corp.* v. *Inland Wetlands Commission*, 258 Conn. 178, 185 n.11, 779 A.2d 134 (2001) (inland wetlands regulations prevent any activity within or use of wetland, watercourse or upland review area involving removal or deposition of material or any obstruction, construction, alteration or pollution of such wetland, watercourse or upland review area, including any clearing, grubbing, filling, grading, paving, excavating, constructing, depositing or removing of material and discharging of storm water); *Mario* v. *Fairfield*, 217 Conn. 164, 165, 585 A.2d 87 (1991) (landowner owning property partially within designated wetlands area must apply for permission to erect any structure on nonwetlands portion); *Aaron* v. *Conservation Commission*, 183 Conn. 532, 535, 441 A.2d 30 (1981) (landowner had to apply for permit from inland wetlands agency to install septic system within 150 feet of watercourse). It is quite logical for a purchaser to bargain for unencumbered land and to use the period of time prior to closing to investigate representations regarding wetlands and to have the option of enforcing or walking away from the transaction should the representation be inaccurate.[6]

---

[6] Furthermore, this purchaser quite clearly thought the matter of whether wetlands existed on the property was important enough to investigate and objected to its existence in a timely manner. Both sides testified that the existence of wetlands was "important." We need not decide whether all

Having determined the meaning of "material" and the impact of a wetlands designation on the use of land, we now turn to the question of whether the representation regarding the presence of wetlands on the property was a material representation. We are mindful that "[o]rdinarily it is not the function of [a reviewing] court to make factual findings, but rather to decide whether the decision of the trial court was clearly erroneous in light of the evidence . . . in the whole record. . . . Conclusions of fact may be drawn on appeal only where the subordinate facts found [by the trial court] make such a conclusion inevitable as a matter of law . . . or where the undisputed facts or uncontroverted evidence and testimony in the record make the factual conclusion so obvious as to be inherent in the trial court's decision." (Citations omitted; internal quotation marks omitted.) *State* v. *Reagan,* 209 Conn. 1, 8–9, 546 A.2d 839 (1988). "[A] reviewing court can draw its own factual conclusions, notwithstanding any contrary factual findings made by the trial court, when the record renders such conclusions inevitable as a matter of law." *Gianetti* v. *Norwalk Hospital,* 266 Conn. 544, 561, 833 A.2d 891 (2003). The referee found that land records indicated the existence of wetlands over the northwest corner of the property. He also found that these soils and the twenty-five foot buffer around them were subject to the environmental protection board's wetlands jurisdiction. The effect was that a permit was required before any construction or development activity within the area may be conducted, as found by the court. The record in the present case requires a finding by this court that the presence of wetlands on the property was material; the finding is inevitable and obvious.

The language of the contract and sound policy encourage the working out of such problems prior to

representations in the disclosure are material; we only decide that in the context of the contractual arrangement here, the representation regarding wetlands was material.

closing. Landsberger sought to rescind the agreement, and to obtain the remedy of restitution, without specifically extending an opportunity to cure. In some factual situations, such precipitous action may constitute a breach, such that the seller's retention of the deposit is justified. In this situation, however, it is unclear whether or not the Traslavinas could have cured the wetlands designation within the cure period. If it is impossible to cure a defect in title within the contractually prescribed time, the purchaser is entitled to terminate the contract as soon as the defect is discovered; futile actions are not required. 14 R. Powell & P. Rohan, supra, § 81.03 [6] [f], p. 81-151.

Accordingly, we reverse the judgment of the court on this claim and remand the case for a determination as to whether the wetlands designation could have been cured within the contract's stated cure period.

### III

Landsberger claims that the court improperly concluded that the Traslavinas did not breach the agreement when they misrepresented that they had obtained the necessary permit and certificate of occupancy for the rear deck. Specifically, Landsberger claims that the misrepresentation that they had obtained the proper permit and certificate of occupancy was either (1) an intentional or negligent misrepresentation that caused the Traslavinas to have breached the agreement upon their signing it or (2) an innocent misrepresentation discovered prior to the consummation of the real estate agreement that would have permitted Landsberger to repudiate the contract if the Traslavinas could not remedy the lack of a building permit and certificate of occupancy within the cure period. We disagree.

The referee found that at some time between 2003 and 2004, the Traslavinas made certain improvements

to the deck, including relocating the stairs and enlarging the deck, despite having failed to obtain a building permit or certificate of occupancy from the city of Stamford for the improvements. He found that Julio Traslavina was credible in stating that, at all times relevant to the transaction, he was not aware of any building permit or certificate of occupancy requirements relating to work performed on the deck. The referee further found that the Traslavinas did not make any statements or provide any information in the agreement regarding the compliance of the deck with building codes or regulations either "negligently or purposely to induce" Landsberger to rely on such statements and to enter into the contract. In denying Landsberger's misrepresentation claims, the court accepted the findings of the referee that because the Traslavinas had made no statement regarding the deck or regarding their compliance or noncompliance with state or municipal building codes for the purpose of inducing Landsberger's reliance, and because such issues were not material to the formation of the agreement, she could not prevail on her claims of misrepresentation. It is undisputed that in addition to adding stairs to the rear deck, the Traslavinas also substantially enlarged the square footage of the deck, that a building permit was required for the work and that neither a building permit nor a certificate of occupancy was obtained prior to the signing of the contract.

Landsberger argues that the court improperly determined that by signing the contract with her attached rider, the Traslavinas were affirmatively representing that they had obtained the necessary permit and certificate of occupancy for the deck.[7] We are not persuaded.

---

[7] Landsberger also argues that the evidence "unequivocally" establishes that the Traslavinas made factual claims regarding the deck that were false and were asserted in such a pattern and fashion that the only reasonable conclusion is that they were made with the purpose of inducing her to enter into a contract with them.

First, she points to the listing agreement for the property, which refers

The parties' agreement specifically limits Landsberger's remedies in the event that a misrepresentation is made in the contract. As stated previously, paragraph 26 provides in relevant part that "[e]xcept in the event of an intentional misrepresentation, if Purchaser discovers any material representation contained in this Agreement including all Attachments to be untrue or inaccurate, the remedy of the parties shall be those available to them in the event of a valid defect in or objection to title." If an unintentional misrepresentation is made, the Traslavinas are permitted to postpone the closing date for thirty days to remedy it. In this case, Landsberger did not permit them to try to remedy the lack of a permit or certificate of occupancy for the deck.

The referee specifically made the factual determination that the Traslavinas could have obtained a permit or certificate of occupancy within thirty days had

to the rear deck as "new," and to paragraph E of the attached rider which referred to the deck at the rear of the premises. Landsberger does not claim that the Traslavinas' description of the deck in their listing agreement was an intentional misrepresentation that induced her to enter into the agreement, nor did the referee decide this claim. Accordingly, we will not decide whether this representation was an intentional or negligent misrepresentation. See *Polizos* v. *Nationwide Mutual Ins. Co.*, 54 Conn. App. 724, 732, 737 A.2d 946 (1999) ("[c]laims that were not distinctly raised at trial are not reviewable on appeal" [internal quotation marks omitted]).

Second, Landsberger describes several instances after the signing of the agreement in which she claims that the Traslavinas misrepresented the actual work performed on the deck. The referee did not make any findings as to any representations made after the agreement was formed, and Landsberger has failed to request an articulation. As our Supreme Court has stated, "we will not address issues not decided by the trial court." *Willow Springs Condominium Assn., Inc.* v. *Seventh BRT Development Corp.*, 245 Conn. 1, 52, 717 A.2d 77 (1998); see also *Crest Pontiac Cadillac, Inc.* v. *Hadley*, 239 Conn. 437, 444 n.10, 685 A.2d 670 (1996) (claims neither addressed nor decided by trial court not properly before reviewing court). Indeed, "[w]hen a trial court has not ruled on an issue before it, the appellant must file a motion for an articulation or rectification asking the court to rule on that matter." *Narumanchi* v. *DeStefano*, 89 Conn. App. 807, 815, 875 A.2d 71 (2005); see generally Practice Book § 66-5.

Landsberger given them the opportunity to cure. This finding was not clearly erroneous. "The law governing [our] limited appellate review is clear. A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . Because it is the trial court's function to weigh the evidence and determine credibility, we give great deference to its findings. . . . In reviewing factual findings, [w]e do not examine the record to determine whether the [court] could have reached a conclusion other than the one reached. . . . Instead, we make every reasonable presumption . . . in favor of the trial court's ruling." (Internal quotation marks omitted.) *Campagnone* v. *Clark*, 116 Conn. App. 622, 628, 978 A.2d 1115 (2009). Reid testified that the Traslavinas would have been able to obtain a permit and certificate of occupancy for the rear deck had they been given the opportunity to do so. Bernstein testified that he did not *think* that the Traslavinas would have been able to obtain the permit or certificate of occupancy because "if it was constructed without a permit, then [the building department does not] issue permits subsequently." The referee was not required to credit Bernstein's testimony over Reid's testimony, especially in light of the fact that the Traslavinas subsequently did obtain a building permit and certificate of occupancy. Accordingly, we conclude that the court did not err when it found in favor of the Traslavinas on the claims of negligent misrepresentation and when it determined that their innocent misrepresentation did not entitle Landsberger to terminate the contract. Because the paragraph regarding representations specifically carves out an exclusion for intentional misrepresentations, we must address Landsberger's claim that the court erred when it determined that the

Traslavinas did not intentionally misrepresent that they had the proper permit and certificate of occupancy for the rear deck.

"A cause of action for intentional misrepresentation is essentially a claim of fraud." *Martinez* v. *Zovich*, 87 Conn. App. 766, 778, 867 A.2d 149, cert. denied, 274 Conn. 908, 876 A.2d 1202 (2005). "Fraud consists [of] deception practiced in order to induce another to part with property or surrender some legal right, and which accomplishes the end designed. . . . The elements of a fraud action are: (1) a false representation was made as a statement of fact; (2) the statement was untrue and known to be so by its maker; (3) the statement was made with the intent of inducing reliance thereon; and (4) the other party relied on the statement to his detriment. . . . Additionally, [t]he party asserting such a cause of action must prove the existence of the first three of [the] elements by a standard higher than the usual fair preponderance of the evidence, which higher standard we have described as clear and satisfactory or clear, precise and unequivocal. . . . The determination of what acts constitute fraud is a question of fact . . . ." (Internal quotation marks omitted.) *McCann Real Equities Series XXII, LLC* v. *David McDermott Chevrolet, Inc.*, 93 Conn. App. 486, 518, 890 A.2d 140, cert. denied, 277 Conn. 928, 895 A.2d 798 (2006).

The referee specifically found that the Traslavinas did not make any representation regarding the deck purposefully to induce Landsberger into signing the agreement. He also found Julio Traslavina to be credible when he stated that he was unaware that a building permit or certificate of occupancy was required for the work on the deck. These factual findings are not clearly erroneous. "It is within the province of the [attorney trial referee], when sitting as the fact finder, to weigh the evidence presented and determine the credibility and effect to be given the evidence." (Internal quotation

marks omitted.) *Burton* v. *Mottolese*, 267 Conn. 1, 40, 835 A.2d 998 (2003), cert. denied, 541 U.S. 1073, 124 S. Ct. 2422, 158 L. Ed. 2d 983 (2004). Because Landsberger failed to prove that the Traslavinas represented that they had obtained the necessary permit and certificate of occupancy for the deck with the intention of inducing her to sign the agreement, her claim of intentional misrepresentation must fail.

## IV

Landsberger next claims that the court erred by referring the trial of this case to the same referee who had previously made factual findings. She argues that she did not receive a new trial because the referee made findings of credibility in the previous trial, the referee was likely to have a "frosty attitude" for having to retry the case when both sides had agreed to a continuance and the referee made the same clearly erroneous findings of fact in both of his reports.[8] We disagree.

Landsberger's argument concerns the meaning of the phrase "new trial" as used in Practice Book § 19-17.[9] This section, however, clearly permits the trial court to refer the matter back to the same attorney trial referee. "The rules of statutory construction apply with equal force to Practice Book rules. . . . Where the meaning of a statute [or rule] is plain and unambiguous,

[8] Landsberger appears to suggest that, because of the circumstances, the referee may have been biased. Landsberger provides no citations to or analysis of case law to support a claim of judicial bias. See *Watkins* v. *Thomas*, 118 Conn. App. 452, 456, 984 A.2d 106 (2009). In addition, Landsberger did not preserve her claim for judicial bias in accordance with Practice Book § 1-23.

[9] Practice Book § 19-17 (a) states in relevant part that "[i]f the court finds that the committee or attorney trial referee has materially erred in its rulings or that there are other sufficient reasons why the report should not be accepted, the court shall reject the report and refer the matter to the *same or another . . . attorney trial referee,* as the case may be, for a new trial or revoke the reference and leave the case to be disposed of in court." (Emphasis added.)

the enactment speaks for itself and there is no occasion to construe it. Its unequivocal meaning is not subject to modification by way of construction." (Citation omitted; internal quotation marks omitted.) *Pitchell* v. *Hartford*, 247 Conn. 422, 432, 722 A.2d 797 (1999). "A cardinal rule of statutory construction is that where the words of a statute [or rule] are plain and unambiguous the intent of the [drafters] in enacting the statute [or rule] is to be derived from the words used. . . . Where the court is provided with a clearly written rule, it need look no further for interpretive guidance." (Internal quotation marks omitted.) *Ficara* v. *O'Connor*, 45 Conn. App. 626, 629, 697 A.2d 696 (1997).

"In a general sense, the term trial means the investigation and decision of a matter in issue between parties before a competent tribunal, including all the steps taken in the case from its submission to the court or jury to the rendition of judgment." (Internal quotation marks omitted.) *Tureck* v. *George*, 44 Conn. App. 154, 157, 687 A.2d 1309, cert. denied, 240 Conn. 914, 691 A.2d 1080 (1997). In this case, the new trial was required to be a proceeding for a reexamination of the facts and circumstances put in issue by the parties' pleadings followed by the referee's conclusions and recommendations. The referee clearly informed the parties on the first day of trial that he would not consider any earlier testimony because the case was being reheard. Landsberger fails to cite to any part of the referee's decision that was not supported by testimony given at the second trial. In addition, Landsberger admitted during the hearing held on her objection to the acceptance of the referee's report that the second decision was different from the first decision "[i]n a few" material ways. We do not conclude that the court erred when it referred the case back to the same referee for a retrial.

The judgment is reversed only as to the finding that Landsberger breached the agreement and the case is

remanded for further proceedings to determine whether the wetlands designation on the property could have been cured within the agreement's stated cure period. The judgment is affirmed in all other respects.

In this opinion GRUENDEL, J., concurred.

BISHOP, J., concurring in part and dissenting in part. Although I agree with the majority that the issue in this appeal regarding the presence of wetlands was incorrectly analyzed by the trial court, I disagree with the notion that we, as a reviewing court, may permissibly engage in fact-finding. As pointed out by the majority, attached to the agreement was a residential property condition disclosure report on which the sellers, the defendants Julio Traslavina and Maria Traslavina, indicated that the property did not contain any wetlands. The agreement provided: "[I]f Purchaser discovers any material representation contained in this Agreement including all Attachments to be untrue or inaccurate, the remedy of the parties shall be those available to them in the event of a valid defect in or objection to title." The majority finds this language clear and unambiguous and, from that perspective, makes its own factual assessment that the presence or absence of wetlands is generally so important that it simply must be material. Unlike the majority, I do not find the meaning of this language to be clear and unambiguous. Additionally, I cannot so readily reach the conclusion that the Traslavinas' representation regarding wetlands was material to the formation of the contract because, respectfully, fact-finding is not our function.

"The question of the parties' intent is [o]rdinarily . . . a question of fact [subject to appellate review under the clearly erroneous standard]. . . . If, however, the language of the contract is clear and unambiguous, the court's determination of what the parties intended in using such language is a conclusion of law. . . . In such a situation our scope of review is plenary, and is

not limited by the clearly erroneous standard. . . . Thus, in the absence of a claim of ambiguity, the interpretation of [a] contract presents a question of law. . . . Well established principles guide our analysis in determining whether the language of a contract is ambiguous. [A] contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself. [A]ny ambiguity in a contract must emanate from the language used by the parties. . . . In contrast, [a] contract is unambiguous when its language is clear and conveys a definite and precise intent." (Internal quotation marks omitted.) *D'Amato Investments, LLC* v. *Sutton*, 117 Conn. App. 418, 423–24, 978 A.2d 1135 (2009).

First, as noted, I do not find the language of the previously referenced agreement provision to be clear and unambiguous. From reading it, I cannot tell whether the parties intended that any inaccuracy or falsehood, no matter how insignificant, in any of the attachments, would trigger the provision requiring the Traslavinas to remedy or cure, or whether such a representation in an attachment must be material to invoke this mechanism. And, because unraveling that linguistic ambiguity implicates the parties' intent in using this imprecise language, I believe that this matter should be remanded to the trial court with direction to make a factual determination as to whether the Traslavinas' representation regarding the absence of wetlands on the property was material to the formation of the parties' agreement. If, based on further testimony adduced on remand, the court determines either that the representation regarding the absence of wetlands was material to the formation of the parties' agreement or that the intent of the parties in utilizing the particular contract language was that any inaccuracy in any of the attachments would entitle the buyer, the defendant Diana Sebastian Landsberger, to demand cure by the Traslavinas, the court

should next determine, from further evidence, whether Landsberger unreasonably prevented the Traslavinas from curing the problem within the time period specified in the agreement. Thus, although I concur that the matter should be remanded, I believe both the questions of materiality and of the reasonableness of Landsberger's refusal to give the Traslavinas an opportunity to cure, if that provision is implicated, must be determined through a fact-finding process. Accordingly, I respectfully concur in part and dissent in part.